Cornell M. JONES, Petitioner–Appellant, Cross–Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee, Cross–Appellant.

Nos. 88–2948, 88–2811.

United States Court of Appeals, Tenth Circuit.

May 21, 1990.

Mark J. Rochon (W. Gary Kohlman, on the briefs), Kohlman & Fitch, Washington, D.C., for petitioner-appellant, cross-appellee.

Charles E. Brookhart (James I.K. Knapp, Acting Asst. Atty. Gen., Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen and Laura Marie Conley O'Hanlon, with him on the briefs), Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee, cross-appellant.

Before McKAY, ANDERSON and BALDOCK, Circuit Judges.

STEPHEN.H. ANDERSON, Circuit Judge.

Cornell Jones appeals a decision of the United States Tax Court sustaining an income tax deficiency for the calendar year 1985 in the amount of $16,490,402 together with additions to tax under 26 U.S.C. §§ 6651(a)(1), 6653(a)(1), 6654, and 6661 totalling $4,125,107. *Jones v. Commissioner,* No. 36601–86 (T.C. Aug. 18, 1988) (Deci-

sion); R. Vol. I, Tab 27.[1] The Tax Court made no mention in its opinion of the Commissioner's asserted addition to Jones' 1985 tax under 26 U.S.C. § 6653(a)(2), and only partially sustained the asserted addition under § 6661. *Jones v. Commissioner,* 55 T.C.M. (CCH) 1556 (1988). The Commissioner cross-appeals as to these two items. We affirm the Tax Court's decision concerning the tax deficiency, and remand for further proceedings to determine the correct amount of additions to the tax.

## BACKGROUND

Jones was arrested on October 29, 1985 by the Washington, D.C. Metropolitan Police Department after having participated in the purchase of what he then believed to be one kilogram of cocaine from undercover police officers. Jones pled guilty to conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 (1982) and he was sentenced to a term of 9 to 27 years imprisonment.

Jones' arrest was the result of a lengthy investigation of large scale drug trafficking taking place at a small area known as Hanover Place in the District of Columbia. Searches of Jones' residence and of several apartments in and around D.C. produced assets worth millions of dollars, including $870,000 cash at his residence and $643,900 cash in bank deposit boxes; three gold ingots; two Mercedes Benz automobiles; jewelry; furs; 28 airline tickets from Washington, D.C. to Las Vegas, Nevada; tickets to a championship fight in Las Vegas; five handguns; over 10.5 kilograms of cocaine; drug packaging paraphernalia; a bill counting machine; communications equipment; and a drug identification kit; all of which convincingly linked Jones to the cocaine trade at Hanover Place. Furthermore, statements by certain individuals

---

[1]. On October 18, 1988 the Tax Court issued an "Order" *sua sponte* which purported to amend its decision by increasing the addition to tax under 26 U.S.C. § 6651(a)(1) and by assessing a final addition to tax related to interest on the deficiency pursuant to 26 U.S.C. § 6653(a)(2). Jones filed his notice of appeal on September 8, 1988; after that date the Tax Court lacked juris-

diction to issue its "Order." It therefore has no effect on the Tax Court's decision dated August 18, 1988. *See, e.g., United States v. 397.51 Acres of Land,* 692 F.2d 688, 693 (10th Cir.1982) (with two recognized exceptions, "[t]he filing of a notice of appeal divests the district court of jurisdiction...."); *SEC v. Investors Security Corp.,* 560 F.2d 561, 568 (3d Cir.1977).

to police officers investigating the Hanover Place operation identified Jones as the organizer behind the significant drug activity taking place.

In January 1986 the IRS made a termination assessment against Jones of $33,990,402 based on $68 million in unreported income from drug related activities which the IRS estimated Jones received in the first ten months of 1985 prior to his arrest. The government later modified its estimate of Jones' drug related income, asserting in its statutory notice of deficiency that Jones received unreported income of $33 million in 1985. Jones kept no records of income from drug sales, and he did not file an income tax return for 1985.

Jones petitioned the Tax Court which upheld the deficiency based on the asserted $33 million income for 1985 and certain additions to tax based on the amount of the resulting deficiency. Jones now appeals the Tax Court's ruling on several grounds, the most relevant of which is that the assessment based on $33 million income is unreasonable and arbitrary.[2]

## DISCUSSION

Ordinarily, the statutory notice of deficiency is presumed correct; the burden rests on the taxpayer to establish that the determination of income is erroneous. *Zell v. Commissioner*, 763 F.2d 1139, 1141 (10th Cir.1985).[3] As a taxpayer, Jones has the duty to maintain adequate and accurate records to enable him to file a tax return. *See* 26 U.S.C. § 6001; *Anson v. Commissioner*, 328 F.2d 703, 705 (10th Cir.1964)

("[T]he privilege of original self-assessment accorded the taxpayer carries with it the burden of support through the maintenance of records which clearly and accurately reflect income."). Where, as here, the taxpayer keeps inadequate records or no records at all the Commissioner is entitled to reconstruct the taxpayer's gross receipts and costs to arrive at an assessment for the unreported income. *See Anson*, 328 F.2d at 705–06; *Adamson v. Commissioner*, 745 F.2d 541, 548 (9th Cir.1984) ("The absence of tax records cannot automatically deprive the Commissioner of a rational foundation for the income determination."). Thus a taxpayer who has abandoned the advantage of mathematical precision by failing to keep adequate records cannot complain that the Commissioner's assessment is based on estimates rather than proven amounts of unreported income. *See Anson*, 328 F.2d at 707 (calculation of unreported tip income by use of arithmetic formula acceptible even though such a method "cannot produce exactness").

Jones offered almost no real evidence to prove that the Commissioner's assessment was erroneous except his weak attempts to distance himself from all drug sales. He made no attempt to suggest a more appropriate or more accurate estimate of his drug related income, nor did he suggest who, if not he, was receiving the majority of income arising from drug trafficking at Hanover Place in 1985. Where no such evidence of error is produced, we might ordinarily rely solely on the presumptive correctness of the deficiency no-

---

**2.** Jones' other contentions relate to hearsay evidence which the Tax Court admitted at trial. Although much of the government's evidence consisted of numerous layers of hearsay evidence, most of these otherwise hearsay statements were admitted for very limited purposes, not to prove their truth. Hearsay is admissible to support the methodology used by the Commissioner in arriving at his deficiency assessment. *See DiMauro v. Commissioner*, 706 F.2d 882, 885 (8th Cir.1983); *Avery v. Commissioner*, 574 F.2d 467, 468 (9th Cir.1978). Furthermore, Jones waived most of his objections to the admissibility of evidence by failing to properly object at trial. The fact that he chose to represent himself at trial in no way excuses this waiver. *Wallis v. Commissioner*, 357 F.2d 313,

314 (10th Cir.1966) (*pro se* appearance before Tax Court, "whether by choice or circumstance, does not lessen the impact of applicable rules").

**3.** At trial, Jones disclaimed any involvement with the drug trade other than the single purchase for which he was arrested. He now claims that the Commissioner's assertion that he received unreported income from illegal drug sales lacks any foundation in fact, thereby making any assessment for such income improper. The evidence produced at trial supports the Tax Court's determination that Jones was in fact involved in drug sales and that he did receive substantial income from sales which he did not report.

tice and dispose of the case without further discussion. As we stated in *Ruidoso Racing Ass'n, Inc. v. Commissioner*, 476 F.2d 502, 507–08 (10th Cir.1973), "With regard to unreported income, the taxpayer must prove that the determination is arbitrary and erroneous...."

We pause, however, to discuss Jones' contention that the sheer magnitude of the government's assessment is itself sufficient to demonstrate that it is arbitrary and erroneous. The $33 million income which the government assigned to Jones over a ten-month period is indeed a figure which almost defies credibility. This court has never directly addressed the outer boundary of reasonableness at which point the bare presumption afforded the Commissioner's assessment must ultimately give way; nevertheless, we believe that such a point probably does exist. The Fifth Circuit has concluded that "[T]he absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes ... [even though] such absence does weaken any critique of the Commissioner's methodology." *Webb v. Commissioner*, 394 F.2d 366, 373 (5th Cir.1968); *see Bradford v. Commissioner*, 796 F.2d 303, 306 (9th Cir.1986); *Walker v. Commissioner*, 757 F.2d 36, 37 (3d Cir. 1985) ("The Internal Revenue Service has sometimes overreacted [to unreported income from illegal sources] by imposing arbitrary assessments."); *United States v. Carson*, 560 F.2d 693, 698 (5th Cir.1977) (unlimited reliance entirely on a bare presumption of correctness is a position "which would support the most arbitrary of assessments" and "does not become the government's agents....").

Jones has not satisfied any evidentiary burden in contesting the Commissioner's assessment. Had he met such a burden, the presumption of correctness afforded the Commissioner's assessment would disappear and the government would be required to prove the accuracy of its determination. *Cf. Ruidoso Racing Ass'n, Inc. v. Commissioner*, 476 F.2d at 508 (where the government's determination is demonstrably arbitrary ... "the Commissioner must satisfy the court as to the existence and amount of unreported income."). Rather than offering any explanation or other evidence concerning the amount of drug-related income he received, Jones merely attempted to prove that he received no income from drug sales. His attempt to distance himself from illegal income failed miserably. He therefore has not demonstrated that the government's estimate is exaggerated or arbitrary, nor has he proved that the government lacks factual basis for its assessment. *See United States v. Janis*, 428 U.S. 433, 442, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976) ("Certainly, proof that an assessment is utterly without foundation is proof that it is arbitrary and erroneous.").

After reviewing the entire record before us, we cannot conclude that the government's assessment lacks any reasonable foundation. The formula used to estimate Jones' income from drug sales is sufficiently related to the amount of drug activity taking place at Hanover Place to withstand review. As we stated in *Anson v. Commissioner*, 328 F.2d at 707:

> "Although assessment by formula cannot produce exactness, it can, when adapted and adjusted to particular facts, be expected to reach substantial correctness.... We agree with the Tax Court that the Commissioner ... adopted a reasonable method to compute [the unreported] income."

The record clearly demonstrates that Jones was involved in the cocaine trade taking place at Hanover Place for some indeterminate period of time prior to his arrest in October 1985. At trial, a Metropolitan Police Department sergeant testified that in the one-block area known as Hanover Place, "there were several locations ... being used for the distribution of the drugs." R. Vol. I, Tab 22 at p. 83. The sergeant stated further: "[t]here was hundreds of people lining the street selling drugs."[4]

4. The testimony of the Metropolitan Police sergeant includes descriptions of the drug trade at Hanover Place as "operating 24 hours a day," with "hundreds" of people working three eight-

As to Jones' involvement in this massive operation, the police sergeant testified that beginning in mid to late 1984,

> "What we did was, we were making arrests. Officers out of my unit were making arrests in the area of the people who were selling right there on the street. The people were brought in and they were interviewed, and they were interrogated as to who was behind the operation on Hanover Place. Several of the individuals that were arrested informed the investigating officers and myself that the person behind the drugs on Hanover Place was Mr. Cornell Jones."

R. Vol. I, Tab 22 at p. 81. In setting up the undercover sale of cocaine substitute to Jones, the police gained further knowledge of his role:

> "Q. How did the police department, in its reverse sale operation with Mr. Jones, how did it initially make contact with Mr. Jones?
>
> A. We did not know that we were actually making contact with Mr. Jones. We had a cooperating individual who said that it had been selling drugs to an individual who identified himself as the Czar of Hanover Place. This individual, to us, was believed to be Mr. Cronell Jones [sic]."

*Id.* at p. 90.

The government originally estimated Jones' unreported income based on an assumption that drug sales at Hanover Place totalled 20 kilograms per week, or 20,000 weekly sales of one-gram bags at the street price of $100 each. The government's revenue agent testified that in preparing the statutory notice of deficiency he had halved the original sales volume "in an effort to come up with what I thought was a more reasonable and conservative estimate ...." *Id.* at 57. The government's assumption concerning the quantity of drugs being sold at Hanover Place in 1985 is primarily based on the following statement by the Metropolitan Police Department sergeant:

> "It was our conservative estimate from the amount of drugs we were seizing from the street, the amount of money we were seizing from the street, the amount of vehicle traffic and pedestrian traffic we were seeing on the street, we came to the determination that there was approximately one kilo per shift going out of Hanover Place. That would be three kilos a day, seven days a week. The street was running constantly. There was hundreds of people lining the street selling drugs."

R. Vol. I, Tab 22 at p. 85. The other basis for the sales quantity figure arises from two statements, one by Jones during the October purchase of cocaine substitute, and the other by Jones' coconspirator in the course of discussions between the coconspirator and government agents leading up to the purchase. The government's undercover agent who negotiated the purchase testified at trial that "He [Jones] said that he could do 20 keys per week." R. Vol. I, Tab 22, at p. 146. The same undercover agent testified that Jones' coconspirator had told him that "he and Cornell were doing approximately 50 kilos per month and they could handle the 10 kilos [we proposed to sell them.]" *Id.* at 133. The Tax Court credited the statements, concluding that they were not mere "puffery." We must accept the Tax Court's factual determinations unless they are not supported by substantial evidence or are clearly erroneous. *House Beautiful Homes, Inc. v. Commissioner,* 405 F.2d 61, 65 (10th Cir.1968).

It is almost certain that the Commissioner's assessment of unreported income is inaccurate. The inaccuracy results, however, not from uncertainty concerning Jones' significant involvement in this massive drug scheme, but from his failure to maintain any records whatsoever reflecting drug related income, and his refusal to even suggest a more accurate amount or

hour shifts. Money and drugs were located in various apartments along the dead end street making up Hanover Place, and the officer testified that "during 1985 the vehicle traffic was so bad [near Hanover Place] that the traffic couldn't get through the block and they would often times double park for blocks away to get into Hanover Place to purchase drugs." R. Vol. I, Tab 22, pp. 78–99.

more reasonable basis to compute his income. There is simply too much evidence supporting the government's assessment of enormous income derived from illegal sources to sustain Jones' attack which in turn is totally devoid of any evidentiary foundation. We conclude that the government's assessment is entitled to a presumption of correctness; therefore, we affirm the Tax Court's decision as to the income tax deficiency for the calendar year 1985.

 The only remaining issue is whether the Tax Court correctly computed the additions to the tax deficiency. The Commissioner contends that the Tax Court erroneously omitted additions under 26 U.S.C. §§ 6651(a)(1) and 6653(a)(2), and that the court incorrectly assessed the addition under § 6661 at ten percent of the tax liability rather than at twenty-five percent. Indeed, from the record before us, it appears that the Tax Court attempted to correct its order by issuing an "amendment" thereto which reflected to some degree the Commissioner's allegations concerning the additions.[5] Because there appears to have been confusion concerning the additions requested by the Commissioner and the appropriate legal standards which apply to those requests, we reverse that part of the Tax Court's decision concerning the additions to the tax deficiency and remand for further proceedings to determine the appropriate additions.

## CONCLUSION

The government has no burden of proof as to its notice of deficiency in the face of Jones' silence at trial except that the assessment it makes must be reasonably based on facts appearing in the record. The record before us amply demonstrates that Jones was significantly involved in a massive drug selling operation for some period preceding his arrest in 1985. The evidence produced at trial supports the Tax Court's conclusion that the assessment of unreported income was reasonable in light of the enormous proceeds which were generated by the Hanover Place drug operation. We therefore affirm the Tax Court's decision sustaining the income tax deficiency. We reverse the assessment of additions to the tax deficiency and remand the case for further proceedings to determine the appropriate amount of the additions.

AFFIRMED in part and REVERSED in part.

---

**5.** The Commissioner concedes that the Tax Court lost jurisdiction to substantively alter its order upon the filing of a notice of appeal. Brief of Appellee–Cross Appellant at 39.