**PUBLISH**

**March 8, 2010**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KAREN MCBETH,

     Plaintiff-Appellee,

v.

JEFFREY HIMES, individually and as an investigator and deputy sheriff of the Arapahoe County Sheriff's Office,

     Defendant-Appellant.

No. 07-1165

---

KAREN McBETH,

     Plaintiff-Appellant,

v.

TERRY L. SANTI, individually and in her capacity as a Department of Human Services Employee; KATHI WAGONER, individually and in her capacity as a Department of Human Services Employee; JEFFREY HIMES, individually and as an investigator and deputy sheriff of the Arapahoe County Sheriff's Office,

     Defendants-Appellees.

No. 07-1283

---

**Appeal from the United States District Court**
**for the D. Colo.**
**(D.C. No. 02-cv-0851-JLK-MJW)**

---

Robin Cochran, Assistant County Attorney (Kathryn L. Schroeder, Arapahoe County Attorney, Douglas Jewell and Sean T. Olson of Bruno, Colin, Jewell & Lowe, P.C., Denver, Colorado, with her on the briefs), Littleton, Colorado, for Defendant-Appellant in Case No. 07-1165.

A. Thomas Elliott, Jr. of A. Thomas Elliott, Jr., P.C., Denver, Colorado, for Plaintiff-Appellee in Case No. 07-1165.

_____

A. Thomas Elliott, Jr. of A. Thomas Elliott, Jr., P.C., Denver, Colorado, for Plaintiff-Appellant in Case No. 07-1283.

Kathleen L. Spalding, Assistant Attorney General (John W. Suthers, Attorney General; Friedrick C. Haines, First Assistant Attorney General with him on the brief), Denver, Colorado, for Defendants-Appellees Terry L. Santi and Kathi Wagoner in Case No. 07-1283.

Robin E. Cochran, Deputy County Attorney, Kathryn L. Schroeder, Arapahoe County Attorney, Littleton, Colorado, and Douglas Jewell and Sean T. Olson of Bruno, Colin, Jewell & Lowe, P.C., Denver, Colorado, filed a brief for Defendant-Appellee Jeffrey Himes in Case No. 07-1283.

---

Before **BRISCOE, EBEL,** and **MURPHY,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

These consolidated appeals arise out of an investigation by the Arapahoe County Sheriff's Office and the Colorado Department of Human Services, Division of Child Care ("DHS") that resulted in Karen McBeth surrendering her license to run a daycare facility in Colorado. The district court granted summary judgment in favor of DHS employees Terry Santi and Kathi Wagoner on all counts on the ground of qualified immunity, and

2

granted Detective Jeffrey Himes qualified immunity on all counts except for McBeth's claim that he retaliated against her for exercising her First Amendment rights. McBeth v. Santi, No. 02-cv-00851-JLK, 2007 WL 274743, at *6 (D. Colo. Jan. 29, 2007). In appeal number 07-1165, Himes appeals the district court's denial of qualified immunity on the First Amendment claim; in appeal number 07-1283, McBeth appeals the district court's grant of qualified immunity on all the other claims. We REVERSE the denial of qualified immunity to Himes, DISMISS the appeal of the grant of qualified immunity to Himes, and AFFIRM the grant of qualified immunity to Santi and Wagoner.

## I.    Background

In 2001, McBeth possessed a valid license issued by DHS, authorizing her to operate a daycare facility in her Littleton, Colorado home. See Colo. Rev. Stat. § 26-6-104(1)(a) (requiring operator of daycare facility to possess a license). Steven Forsyth, McBeth's adult son, also lived in the house at the time. Forsyth had visitation rights with his minor daughter, E.F., every other weekend. E.F. spent the weekend of June 23, 2001 with her father at McBeth's home. One of E.F.'s friends, E.W., spent time with E.F. and Forsyth that weekend, and afterwards told her parents that Forsyth had sexually assaulted both her and E.F. E.W.'s parents contacted the police and, on June 24, the police went to McBeth's home and arrested Forsyth.

3

Jeffrey Himes, an investigator with the Arapahoe County Sheriff's Office assigned to the Child Victims Unit, was assigned to investigate the charges against Forsyth. On June 25, Himes asked McBeth for her records concerning the children who currently attended her daycare, and McBeth voluntarily complied. At some point either on the 25th or the 26th, Himes also asked McBeth for the records regarding all the children who had attended the daycare since 1995, when Forsyth began living with McBeth. On the 26th, McBeth informed Himes that she had consulted with an attorney, who told her that she did not have to turn over any records in the absence of a court order directing her to do so. Pursuant to that advice, McBeth declined to provide the additional records Himes sought. Later that same day, Himes obtained and executed a search warrant for the records in question, and McBeth then turned them over. None of the parents contacted by Himes claimed that Forsyth molested or abused their children.

While Himes was conducting the police investigation, DHS began its own investigation. On June 25, the day following her son's arrest, McBeth called Kathi Wagoner, a Licensing Specialist employed by Front Range Community College.[1] Wagoner was responsible for conducting licensing interviews on behalf of DHS, as well as investigating allegations of child abuse. During their conversation on June 25, McBeth informed Wagoner of her son's arrest and told her that the alleged conduct took place in McBeth's home. McBeth apparently only told Wagoner that Forsyth was

[1] Front Range Community College contracts with DHS to provide licensing and inspection services for daycare facilities.

4

accused of molesting his daughter and did not mention E.W. After speaking to McBeth, Wagoner called Terry Santi, her supervisor at DHS, and informed Santi of her conversation with McBeth.

On June 26, according to McBeth, after she denied Himes' request for her records dating back to 1995, Himes complained to Santi at DHS that McBeth was refusing to cooperate with the police investigation by withholding the records of her former daycare clients. McBeth alleges that as a result of this complaint, Wagoner came to McBeth's home and threatened to take her daycare license. Prior to doing so, Wagoner told McBeth that she was required to produce the records sought by Himes. While Wagoner was in McBeth's home, McBeth spoke to Santi on the phone, who informed her that DHS would suspend her license because of Himes' "complaint" that she was not cooperating with the police. Santi informed her that if she voluntarily relinquished her license, it would be easier for McBeth to have it reinstated. Directly as a result of this "coercion," McBeth argues, she surrendered her license to Wagoner.

The defendants dispute significant portions of this account of the June 26 events. The parties agree that Himes informed DHS on June 26 that McBeth was refusing to turn over her records.[2] According to Santi, however, the information provided by Himes did

---

[2] The defendants have some disagreement among themselves as to who initiated the contact. Himes maintains that he did not "complain" to DHS about McBeth's refusal to turn over her records; instead, Himes stated that he "either answered a telephone call from [DHS] or returned a call to DHS" in which he informed the DHS employee with whom he spoke that McBeth denied him access to past records and that he was obtaining

Continued . . .

not cause DHS to seek to retaliate against McBeth; rather, the nature of the charges against Forsyth and the potential threat of harm to children resulted in DHS assigning the complaint against McBeth a severity level of one, which is the second highest level of seriousness and requires inspection and contact with the licensee within forty-eight hours. Pursuant to this categorization of the complaint, Wagoner visited McBeth on June 26. Before going to McBeth's house, Wagoner first contacted Himes, who informed her that he was in the process of obtaining a warrant and assured her that her visit would not interfere with his investigation. Wagoner told McBeth that she was there "because of a complaint received concerning [McBeth's] refusal to cooperate with authorities." (App. at 271.) McBeth informed Wagoner that her attorney advised her to withhold the records; this is the first time that the record shows either Wagoner or Santi learned that McBeth had spoken with an attorney.

Wagoner suggested that if McBeth felt uncomfortable turning over the records to the police, McBeth could turn them over to her instead, but McBeth declined to do so. While Wagoner was still at McBeth's house, Wagoner received a call from Santi, who told her that she had learned from Himes that a second child victim (E.W.) had been identified, and that because the charges now extended beyond the immediate family,

a search warrant. (App. at 432.) Santi claims that "DHS received a complaint from" Himes on June 26 that McBeth was not cooperating with the police and was withholding the records of former clients. (Id. at 262.) Regardless of who initiated the contact and whether the conversation is appropriately categorized as a "complaint," the defendants and McBeth all agree that Himes informed DHS on June 26 that McBeth refused to surrender her records.

6

DHS had decided to proceed with emergency suspension of McBeth's license. Santi and Wagoner then explained McBeth's options to her, and told her that it would be easier to have her license reissued if she voluntarily surrendered it because that would not appear on her permanent record. Although initially reluctant to do so, McBeth ultimately gave Wagoner her license.

McBeth brought suit against Santi, Wagoner, and Himes, alleging violations of her Fourth, Sixth, and Fourteenth Amendment rights, and seeking a declaratory judgment, damages, and injunctive relief pursuant to 42 U.S.C. § 1983.[3] Shortly after commencing her suit, McBeth applied for and received a new daycare license, and she has accordingly withdrawn her claim for injunctive relief. The defendants all moved for summary judgment on the ground that they are entitled to qualified immunity. The district court granted Santi and Wagoner's motion for summary judgment, concluding that they did not violate any clearly established rights of McBeth. McBeth, 2007 WL 274743, at *6. The court also granted in part Himes' motion for summary judgment on the ground of qualified immunity, but concluded that a factual dispute precluded summary judgment as to McBeth's claim that Himes violated her constitutional rights by retaliating against her for consulting with an attorney. Id. at *4-6. The district court denied Himes' motion to reconsider. In appeal number 07-1165, Himes appeals the district court's denial of

---

[3] McBeth also sued DHS, but the district court dismissed those charges. In addition, McBeth brought a claim under 42 U.S.C. § 1985(3) against all the defendants for conspiracy to interfere with her civil rights, but the district court dismissed that as well. Neither of these dismissals are the subject of the present appeals.

7

summary judgment on qualified immunity grounds. In appeal number 07-1283, McBeth appeals the district court's grant of summary judgment to Himes, Santi, and Wagoner. Based on the common facts, record, and parties, this court consolidated the appeals.

## II.     Discussion

### A.     Himes

The district court denied Himes' motion for summary judgment on qualified immunity grounds as to McBeth's claim that Himes called DHS in retaliation for McBeth exercising her First Amendment right to consult with an attorney. Id. at *4-5. The court also granted Himes' motion for summary judgment regarding McBeth's claims that he violated her Fourth and Fourteenth Amendment rights. Id. at *5-6. Both of these decisions have been appealed.

#### 1.     Denial of qualified immunity on First Amendment claim

##### a.     Jurisdiction

Turning to Himes' appeal of the district court's denial of summary judgment on qualified immunity grounds, we first note that denial of a summary judgment motion is generally not an appealable order under 28 U.S.C. § 1291. See Bowling v. Rector, 584 F.3d 956, 963 (10th Cir. 2009). We do possess jurisdiction over such an appeal, however, "when the defendants are public officials asserting a qualified immunity defense and the appealed issue is whether a given set of facts establishes that defendants violated clearly established law." Id. (quotation omitted); see also Mitchell v. Forsyth,

472 U.S. 511, 530 (1985). Thus, while we may consider "neat abstract issues of law" presented on appeal, we lack jurisdiction over the appeal to the extent it requires us to determine "whether the record supports the district court's factual assumptions." Bowling, 584 F.3d at 963 (quoting Johnson v. Jones, 515 U.S. 304, 317, 319-20 (1995)) (internal quotation omitted).

Here, the district court did state that Himes' motive in discussing McBeth's situation with DHS presented a factual dispute for a jury to resolve. McBeth, 2007 WL 274743, at *5; see also 3/13/07 Minute Order (Doc. No. 78) (recognizing that a "factual dispute preclud[es] entry of summary judgment in Defendant Himes's favor"). We lack jurisdiction to consider the district court's conclusion that a genuine issue of material fact precludes summary judgment here. See Dixon v. Kirkpatrick, 553 F.3d 1294, 1301 (10th Cir. 2009) ("A district court's determination that the record raises a 'genuine issue of material fact,' precluding summary judgment in favor of the defendants is not appealable even in a qualified immunity case.").

Himes contends, however, that even if he possessed a retaliatory motive when he spoke to DHS, he is nevertheless entitled to qualified immunity because he did not violate any clearly established constitutional right of McBeth's. This presents strictly legal questions—whether his retaliatory conduct violated McBeth's First Amendment rights, and, if so, whether such rights were clearly established at the time—and we may properly consider them on appeal. See Eaton v. Meneley, 379 F.3d 949, 955 (10th Cir. 2004) ("Even if issues of fact exist, we have jurisdiction because we inquire only into the

9

legal question whether [defendant's] conduct, as alleged by the plaintiffs and construed in the light most favorable to them, would violate constitutional law."); see also Johnson v. Martin, 195 F.3d 1208, 1214 (10th Cir. 1999) ("[I]f a defendant's appeal of the denial of a motion for summary judgment is based on the argument that, even under the plaintiff's version of the facts, the defendant did not violate clearly established law, then the district court's summary judgment ruling is immediately appealable.").

### b.    Standard of review

"We review de novo the district court's denial of a summary judgment motion asserting qualified immunity." Bowling, 584 F.3d at 963.  Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  In applying this standard, we construe the evidence in the light most favorable to McBeth as the non-moving party.  See Bowling, 584 F.3d at 964.

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." Id. (quoting Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc)).  When a defendant asserts a qualified immunity defense, the plaintiff must "meet a strict two-part test." Id. (quotation omitted).  The plaintiff must establish "(1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct," id. (quotation omitted),

10

but we have discretion to "decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, --- U.S. ---, 129 S. Ct. 808, 818 (2009).

### c.    First Amendment retaliation

Turning to the merits of Himes' appeal, Himes contends that the district court erred in denying his motion for summary judgment on McBeth's First Amendment retaliation claim on qualified immunity grounds. Himes initially argues that McBeth never even brought such a claim against him. Although the Complaint does refer to "Plaintiff's Sixth Amendment Right to Counsel," it neither states which Defendants allegedly violated that right, nor does it so much as mention the First Amendment. (App. at 15.) Not until McBeth's response to Himes' motion for summary judgment did she clearly allege a retaliation claim against Himes, and that claim was based on the Sixth Amendment.

While dismissing McBeth's Sixth Amendment retaliation claim on the ground that the Sixth Amendment was never implicated because she was never charged with a crime, the district court also analyzed her retaliation claim under the First Amendment. McBeth, 2007 WL 274743, at *4. "Generally, failure to set forth in the complaint a theory upon which the plaintiff could recover does not bar a plaintiff from pursuing a claim." Elliott Indus. Ltd. v. BP Am. Prod. Co., 407 F.3d 1091, 1121 (10th Cir. 2005). If the new theory prejudices the other party in maintaining its defense, however, courts will not permit the plaintiff to change her theory. See Ahmad v. Furlong, 435 F.3d 1196,

11

1202 (10th Cir. 2006) ("A plaintiff should not be prevented from pursuing a claim simply because of a failure to set forth in the complaint a theory on which the plaintiff could recover, provided that a late shift in the thrust of the case will not prejudice the other party in maintaining its defense." (quoting Green Country Food Mkt., Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1279 (10th Cir. 2004) (internal quotation omitted).

Himes has not argued that he was prejudiced by the failure of McBeth to assert the claim as a First Amendment retaliation claim as opposed to a Sixth Amendment retaliation claim. Indeed, Himes was on notice of a claim concerning McBeth's right to counsel as early as the Complaint, and she put Himes on further notice of the basis for the allegations in her response to Himes' motion for summary judgment. (See McBeth's Resp. to Himes' Mot. for Summ. J., App. at 126 (arguing that, under the Sixth Amendment, "a person has the right to seek legal advice when confronted with a request for materials or documents from a law enforcement official" and not to be retaliated against for doing so).) We therefore fail to see any prejudice that resulted from the district court's decision to treat McBeth's retaliation claim as arising under the First Amendment, and, accordingly, we conclude that her claim is properly before us.

We have previously recognized that "[t]he right to retain and consult with an attorney . . . implicates . . . clearly established First Amendment rights of association and free speech." DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990). Those rights "are violated when a police officer retaliates" against an individual for seeking legal advice. Malik v. Arapahoe Co. Dep't of Social Servs., 191 F.3d 1306, 1315 (10th Cir. 1999). To

12

recover under a First Amendment retaliation claim, McBeth must establish that (1) she was "engaged in constitutionally protected activity," (2) the defendant's actions caused her to suffer an "injury that would chill a person of ordinary firmness from continuing to engage in that [protected] activity," and (3) the defendant's actions "were substantially motivated as a response to [her] protected conduct."  See Nielander v. Bd. of County Comm'rs, 582 F.3d 1155, 1165 (10th Cir. 2009) (citing Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)).  Himes does not dispute that McBeth's consultation with an attorney constituted constitutionally protected activity.  See DeLoach, 922 F.2d at 620.  Also, the district court concluded that a factual dispute existed as to whether Himes acted with a retaliatory motive, and, as noted above, we lack jurisdiction to consider the propriety of that determination.  See Johnson, 515 U.S. at 313 (holding that portion of a summary judgment order that turns exclusively on an issue of evidence sufficiency is not appealable).  Thus, neither the first nor third elements of McBeth's First Amendment retaliation claim can support reversing the district court's denial of summary judgment.

Himes focuses his argument on appeal on the second element: namely, whether Himes' actions caused McBeth to suffer an injury that would chill a person of ordinary firmness from consulting with an attorney.  McBeth alleges that, because she consulted with an attorney, Himes informed DHS that she was not cooperating with the investigation, which led to her injury when DHS threatened her with suspension of her daycare license and coerced her into agreeing to relinquish her license.  Himes contends that, even accepting McBeth's allegations as true, her allegations do not establish that

13

Himes' complaint to DHS caused McBeth's injury. Although "causation is generally a jury question," Stevens v. Barnard, 512 F.2d 876, 879 (10th Cir. 1975), whether a plaintiff sufficiently alleges causation is a legal question, see United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1517 n.1 (10th Cir. 1996) (noting that "the sufficiency of the allegations underlying [a] claim is a legal question"). Thus, because determining whether the allegations suffice to show causation does not require this court to "second-guess[] the district court's determinations of evidence sufficiency," we may consider whether Himes is entitled to qualified immunity on the basis of a lack of causation between Himes' conduct and McBeth's injury, based on the version of facts most favorable to McBeth. Gross v. Pirtle, 245 F.3d 1151, 1156-57 (10th Cir. 2001).

Himes contends that his alleged complaint to DHS could not have caused DHS to seek suspension of McBeth's daycare license because DHS already possessed the legal authority to suspend McBeth's license and would have done so even in the absence of his complaint. In Hartman v. Moore, 547 U.S. 250 (2006), the Supreme Court held that the causation required in a First Amendment retaliatory prosecution claim connecting a retaliatory motive to the adverse action taken by the defendant is "but-for causation, without which the adverse action would not have been taken."[4] Id. at 260. In Hartman,

---

[4] The claim in Hartman was brought against federal officials pursuant to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), but the Court made clear that its holding applied to § 1983 claims against state officials as well. See Hartman, 547 U.S. at 255 n.2, 259, 261 (discussing § 1983 claims); see also Becker v. Kroll, 494 F.3d 904, 925 (10th Cir. 2007) (applying Hartman to a § 1983 retaliation claim).

14

the plaintiff alleged that police initiated a criminal prosecution against him in retaliation for his protected speech. See id. at 254. The defendant there was the police officer, and yet the adverse action, the criminal prosecution, had to be initiated by the prosecutor. See id. at 261-62. In the retaliatory prosecution context, the Court noted the difficulty in establishing causation because the lawsuit generally must be brought against the law enforcement officer who acted with the retaliatory motive, as the prosecutor enjoys absolute immunity for his prosecutorial decisions. Id. at 261-62. Thus, unlike in the normal retaliation case, where the same person possesses the retaliatory animus and takes the adverse action against the plaintiff, in the retaliatory prosecution context, the requisite causal connection is "between the retaliatory animus of one person and the action of another." Id. at 262. To "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action," the Court held that a plaintiff bringing a claim for retaliatory prosecution must allege and prove an absence of probable cause. Id. at 263.

Himes argues that we should extend Hartman to this case because the causation at issue here poses the same problems as that in the retaliatory prosecution context. As in Hartman, the retaliatory animus was held by a different person (Himes) than those who acted adversely to McBeth by seeking the suspension of her license (Santi and Wagoner). See id. at 262 (noting that the cause of action at issue is not "strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute"). Accordingly, just as the plaintiff in a retaliatory prosecution case must allege and prove the absence of probable cause, Himes argues that McBeth should be required to show the lack of a legal

15

basis for the adverse actions taken by DHS.  Because McBeth has not so much as alleged the lack of any such basis—indeed, Colorado law permits DHS to suspend a license if an administrative judge finds that substantial evidence shows that someone living in the same house as the daycare facility commits an act of child abuse, Colo. Rev. Stat. § 26-6-108(2)(k), or if the license holder refuses to cooperate with a DHS investigation, Colo. Rev. Stat. § 26-6-108(2)(f)—Himes contends that he is entitled to qualified immunity on McBeth's retaliation claim.

McBeth disputes the applicability of Hartman to this case.  According to McBeth, Hartman applies solely to retaliatory prosecution cases, which this is not.  McBeth points out that Hartman discusses not only the difficulty in establishing a causal chain inherent in retaliatory prosecution claims, but also the unique role of the prosecutor and the "long-standing presumption of regularity accorded to prosecutorial decisionmaking" in federal courts.  Hartman, 547 U.S. at 263.  Hartman emphasized that "[i]t is . . . the need to prove a chain of causation from animus to injury, with details specific to retaliatory-prosecution cases, that provides the strongest justification for the no-probable-cause requirement." Id. at 259 (emphasis added); see also Skoog v. County of Clackamas, 469 F.3d 1221, 1234 (9th Cir. 2006) ("[D]ifferences between retaliatory prosecution claims and other retaliation claims justified and necessitated the additional requirement in retaliatory prosecution claims.").  McBeth therefore argues that Hartman does not impose any additional burden on a plaintiff alleging a retaliation claim such as hers, and because she has alleged that Himes' complaint was the cause of the DHS investigation that ultimately

16

led to the suspension of her license, she has sufficiently alleged the causation element.

We agree with Himes that the Hartman framework applies to these facts. As in Hartman, the retaliation claim against Himes is really for "successful retaliatory inducement" of DHS to seek suspension of McBeth's license. Hartman, 547 U.S. at 262. This case thus presents the same difficulties in tracing the chain of causation as Hartman did, as the defendant who allegedly acted with the retaliatory animus is not the same individual as the one who caused Plaintiff's injury. It would therefore be just as difficult to establish that DHS would not have sought suspension of McBeth's license in the absence of Himes' complaint as it is to determine whether charges would have been brought in the absence of a retaliatory motive on the part of the investigator. Id. at 260 ("If there is a finding that retaliation was not the but-for cause of the [adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.").

The Court in Hartman drew a distinction between the sort of retaliation case it had in mind and an "ordinary" retaliation claim, such as a "public employee's claim that he was fired for speech criticizing the government." Id. at 259. The Court stated that a retaliatory prosecution case differs from the ordinary retaliation case in two ways: first, a retaliatory prosecution claim possesses a distinct body of highly relevant evidence (i.e. evidence of probable cause) that is "apt to prove or disprove retaliatory causation," and second, the more complex causation involved when the retaliator brings about the injury through the acts of a third party (such as a prosecutor). Id. at 261-62. Both of these

17

distinctions show that McBeth's claim is more akin to the retaliatory prosecution claim than the "ordinary" retaliation claim. As to the second factor, the causation inquiry is complicated by the fact that Himes only made a complaint, and it was DHS employees who acted on it and caused McBeth's injury. And, just like in Hartman, we have a body of evidence here that will be highly probative of whether Himes' retaliatory conduct really was the but-for cause of McBeth's eventual loss of her license: whether the DHS employees possessed legal authority to seek suspension of McBeth's license. The rationale of the Hartman holding therefore applies to these facts.

While we have not directly considered this question before, other circuits have also applied Hartman beyond claims in which a police officer is sued for retaliation on the basis of the subsequent actions of a prosecutor. In Williams v. City of Carl Junction, 480 F.3d 871 (8th Cir. 2007), for example, the Eighth Circuit applied Hartman to the plaintiff's claim that the mayor's animus towards him because of his protected speech criticizing town officials led to city officials issuing the plaintiff twenty-six citations over a two-year period. Id. at 876. The Eighth Circuit concluded that "the Supreme Court's holding in Hartman is broad enough to apply even where intervening actions by a prosecutor are not present," and applied the probable cause requirement "to 'bridge the gap' in these circumstances between the Mayor's retaliatory animus and the officers' 'prosecution.'" Id. (quoting Hartman, 547 U.S. at 263). Courts have also extended the Hartman requirement of alleging a lack of probable cause to apply to retaliatory prosecution claims where the police officers obtained an indictment directly from a grand

18

jury without "the intervening actions of a prosecutor."   See Barnes v. Wright, 449 F.3d 709, 720 (6th Cir. 2006); and to at least some Fourth Amendment false arrest claims, see Beck v. City of Upland, 527 F.3d 853, 864 (9th Cir. 2008).  While we do not hold that the Hartman rule is applicable to "ordinary" retaliation claims, we do think that the logic of the rule necessitates its application here, where "multi-layered causation" complicates the court's inquiry into whether the defendant's retaliatory animus caused the adverse action that harmed the plaintiff.  Skoog, 469 F.3d at 1234 (declining to extend Hartman to case of "ordinary" retaliation that did not involve complex questions of causation).

We therefore conclude that McBeth must allege and prove that the state officials lacked cause to seek suspension of her license.  She has not done so.  Colorado Revised Statute § 26-6-108(2)(f) permits DHS to suspend the license of any individual who "refuse[s] to make available to the department any records required by it in making investigation of the facility for licensing purposes."  Subsection (2)(k) of the same statute allows suspension of a daycare license if anyone who lives with the licensee is charged with an "unlawful sexual offense" and an administrative law judge concludes that substantial evidence supports the charge.  Colo. Rev. Stat. § 26-6-108(2)(k). Additionally, DHS is entitled to suspend a license summarily if it "has objective and reasonable grounds to believe and finds upon a full investigation, . . . that the public health, safety, or welfare imperatively requires emergency action," provided that a hearing is held promptly after the emergency suspension.  Colo. Rev. Stat. § 24-4-104(4)(a).  A "full investigation means a reasonable ascertainment of the underlying facts

19

on which the agency action is based." Id. Thus, DHS had ample bases to seek the suspension of McBeth's license regardless of any complaint made by Himes.

As the Court stated in Hartman, the "connection" that "bridge[s] the gap" between the official with the retaliatory animus and the official who takes the adverse action against the plaintiff "is the absence of probable cause." Hartman, 547 U.S. at 263. Here, Santi and Wagoner had reasons to seek the suspension of McBeth's license; accordingly, McBeth cannot prove the causation element of her retaliation claim. Himes is therefore entitled to summary judgment on the ground of qualified immunity on this claim, because he did not violate any clearly established right possessed by McBeth, even if he called DHS with the motive to retaliate against McBeth.

### 2.    Grant of qualified immunity

The district court granted Himes summary judgment on qualified immunity grounds with respect to McBeth's Fourth and Fourteenth Amendment claims. Although McBeth seeks to appeal this determination in appeal no. 07-1283, we lack jurisdiction to consider it.

Because the district court did not enter judgment on all the claims in McBeth's case, we do not have jurisdiction under 28 U.S.C. § 1291 unless the district court certified its decision as final and appealable under Fed. R. Civ. P. 54(b).[5] See Okla. Turnpike

---

[5] Rule 54(b) provides:

When an action presents more than one claim for relief—whether as a

Continued . . .

Auth. v. Bruner, 259 F.3d 1236, 1243 n.5 (10th Cir. 2001) ("28 U.S.C. § 1291 only confers jurisdiction over final decisions of district courts, and as we have discussed, the district court has not certified a final judgment under Rule 54(b). . . . Thus, under no statutory provision do we possess jurisdiction to hear the merits of [Defendant's] appeal.").

After the district court's decision granting qualified immunity to Santi and Wagoner on all claims and to Himes on all claims but the First Amendment retaliation claim, McBeth filed a motion entitled "Motion for Final Judgment and Permission to Appeal Order for Summary Judgment re Defendants Santi and Wagoner." (App. at 596.) Although the motion did not list Himes in its title or introductory paragraph, in the body of the motion, McBeth did argue that, in light of the fact that Himes is already taking an interlocutory appeal of the denial of qualified immunity on McBeth's First Amendment claim against him, it only makes sense to allow her to appeal the district court's decision "on qualified immunity as to <u>all defendants</u>." (<u>Id.</u> at 597 (emphasis added).) In that

claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b).

motion, McBeth further asserted that attorneys for Santi, Wagoner, <u>and</u> Himes did not oppose McBeth's certification motion. (<u>Id.</u> at 597-98.) And, at the conclusion of that motion, McBeth requested "that the Court make its summary judgment on qualified immunity grounds in favor of Defendants Santi and Wagoner and those rulings in favor of Jeffrey Himes [] on qualified immunity grounds final allowing Plaintiff leave to appeal its orders in that regard to the U.S. Court of Appeals for the 10th Circuit." (<u>Id.</u> at 598.) The title of McBeth's certification motion, therefore, indicated she sought certification only as to her claims against Santi and Wagoner, but the body of the motion indicated that she sought certification on all of her unsuccessful claims asserted against all three defendants.

On June 12, 2007, the district court granted McBeth's "Motion for Final Judgment and Permission to Appeal Order for Summary Judgment re Defendants Santi and Wagoner" without elaboration. (<u>Id.</u> at 600.) McBeth then filed her notice of appeal from the district court's decision granting "summary judgment on qualified immunity grounds on all claims as to the Defendants Santi and Wagoner <u>and on certain claims as to Defendant Jeffrey Himes</u>." (<u>Id.</u> at 601 (emphasis added).)

The Tenth Circuit requested that the district court clarify its Rule 54(b) certification because the "certification entered by the district court does not articulate the reasons for granting the certification, as required by <u>Stockman's Water Co. v. Vaca</u>

22

Partners, 425 F.3d 1263, 1265 (10th Cir. 2005)."[6]  (App. at 607.)  In response, the district

court entered an order clarifying its earlier Rule 54(b) certification.  In that clarification

order, the district court again referred to McBeth's "Motion for [Entry of] Final Judgment

and Permission to Appeal Order for Summary Judgment re Defendants Santi and

Wagoner."  (Id. at 610.)  Throughout the body of that order, the district court referred

only to McBeth's claims against Santi and Wagoner.  And the district court expressly

directed the clerk "to enter final judgment against Plaintiff and for Defendants Santi and

Wagoner on each of Plaintiff's claims against them."  (Id. at 612-13.)  The district court

clerk did so as to those two defendants only.

Therefore, as judgment has only been entered against McBeth on Santi's and

Wagoner's claims, this court lacks jurisdiction to consider McBeth's appeal of the district

court's grant of qualified immunity for Himes.  See Heimann v. Snead, 133 F.3d 767, 770

(10th Cir. 1998) (recognizing that failure to obtain a Rule 54(b) certification from the

district court is a "jurisdictional defect").  McBeth cannot point to any order by the

district court that enters final judgment against Himes or otherwise provides a basis for

her to appeal the district court's decision granting Himes summary judgment.

McBeth nevertheless urges that Himes has no reason to contest this, because the

---

[6] Stockman's Water Company held "that courts entering a Rule 54(b) certification should clearly articulate their reasons and make careful statements based on the record supporting their determination of finality and no just reason for delay so that we can review a 54(b) order more intelligently and thus avoid jurisdictional remands."  425 F.3d at 1265 (quotation, alterations omitted).

23

appeal will only return once final judgment is entered against Himes, and the parties will need to brief and argue the same issues a second time. This may be true, but her appeal suffers from a jurisdictional defect, and we may not consider an appeal over which we lack jurisdiction. In fact, we have previously rejected the notion that efficiency for the parties and the court can provide a reason to overlook a jurisdictional deficiency caused by a failure to comply with Rule 54(b).

> To be sure, once parties have expended the effort of briefing and argument on appeal, it may appear wasteful and inefficient for the appellate court to decline to rule. But in the long run it will be less wasteful and more efficient for district and appellate courts to adhere to . . . Rule 54(b).

Jordan v. Pugh, 425 F.3d 820, 829 (10th Cir. 2005). Accordingly, we dismiss McBeth's appeal of the order granting Himes summary judgment for lack of jurisdiction.

### B. Santi and Wagoner

The district court granted summary judgment in favor of Santi and Wagoner on all of McBeth's claims based on qualified immunity grounds and, as noted, certified the judgment as final. We therefore possess jurisdiction to consider McBeth's appeal as to Santi and Wagoner pursuant to 28 U.S.C. § 1291.

The same de novo standard of review applies to our review of the district court's grant of summary judgment on qualified immunity grounds as it did for our consideration of the district court's denial of summary judgment on those same grounds. See, e.g., Thomson v. Salt Lake County, 584 F.3d 1304, 1311 (10th Cir. 2009). Additionally, because the district court entered summary judgment in favor of Santi and Wagoner, our

jurisdiction is not limited, as it was in our review of her retaliation claim against Himes, to reviewing only "neat abstract issues of law." Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc., 413 F.3d 1163, 1165 (10th Cir. 2005) (quotation omitted). Rather, we review the entire record to determine whether a genuine issue of material fact exists and, if not, whether the substantive law was correctly applied. See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998). "In determining whether [McBeth] has met [her] burden of establishing a constitutional violation that was clearly established, we will construe the facts in the light most favorable to [McBeth] as the nonmoving party." Thomson, 584 F.3d at 1312.

### 1. Fourteenth Amendment

McBeth claims that Santi and Wagoner violated her procedural due process rights by coercing her into relinquishing her daycare license without affording her notice of any violations and an opportunity to be heard. The Fourteenth Amendment to the United States Constitution ensures that state officials shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend XIV; see also Ward v. Anderson, 494 F.3d 929, 932 n.3 (10th Cir. 2007) ("[T]he Fourteenth Amendment imposes a due process requirement on state officials."). McBeth contends that she possessed both a liberty and a property interest in her license and that she was deprived of the license without due process of law.

The initial problem with McBeth's theory is that she voluntarily relinquished her license before any suspension proceedings could take place. The district court thus

25

concluded that "[b]ecause McBeth relinquished her license and no formal suspension proceedings were ever initiated, the facts alleged simply do not fit within the due process rubric." McBeth, 2007 WL 274743, at *6. Indeed, if one voluntarily relinquishes some property or liberty interest, then she cannot have a claim for a due process violation because no state official deprived her of the interest. See, e.g., Potts v. Davis County, 551 F.3d 1188, 1194 (10th Cir. 2009) ("[I]f [a] Plaintiff[] resigned of [his] own free will, even as a result of Defendant's actions, then [he] voluntarily relinquished [his] property interests and, thus, Defendant did not deprive [him] of property without due process of law." (brackets in original) (quotation omitted)).

McBeth claims, however, that her relinquishment of the license was not actually voluntary, but was rather coerced by Santi's and Wagoner's threats of initiating suspension proceedings. In the public employment context, one's resignation can be "so involuntary" as to "deprive her of her property interest without due process." Parker v. Bd. of Regents of Tulsa Junior Coll., 981 F.2d 1159, 1162 (10th Cir. 1992). Here, however, Santi and Wagoner provided McBeth the alternative of voluntary relinquishment of her daycare license as a less punitive option than proceeding with suspension proceedings. McBeth has not disputed that the officials had, or imminently could obtain, authority to suspend her license, given the presence of Forsyth in her home, as well as her refusal to cooperate fully with authorities. See Colo. Rev. Stat. § 26-6-108(2)(k) (permitting DHS to suspend the license of anyone who lives with an individual charged with the commission of an act of child abuse if an administrative law judge

26

determines the charge is supported by substantial evidence); Colo. Rev. Stat. § 26-6-108(2)(f) (permitting DHS to suspend the license of anyone who "refuse[s] to make available to the department any records required by it in making investigation of the facility for licensing purposes"); see also Colo. Rev. Stat. § 24-4-104(4)(a) (permitting state agency to "summarily suspend [a] license pending proceedings for suspension" when it determines that "the public health, safety or welfare imperatively requires emergency action"). Nor does McBeth challenge that Santi and Wagoner were truthful when they informed her that voluntary surrender of the license would not remain on her record as a "negative licensing action," while a suspension pursuant to DHS procedures would. See id. § 26-6-102(5.7)(a) (defining "negative licensing action" to include suspension of a license, but not voluntary relinquishment).

Thus, McBeth cannot credibly claim that Santi and Wagoner coerced her into voluntarily relinquishing her license when their suggestion that she do so arguably provided a less punitive option than the action DHS was otherwise lawfully considering. McBeth had the option of voluntarily relinquishing her license and not having any mark on her permanent record that might impair her reapplication for a license, or of invoking the administrative procedures to which she would be entitled if DHS sought suspension of her license. See Colo. Rev. Stat. § 26-6-108(3) ("The department shall suspend or revoke a license only in conformity with the provisions and procedures specified in article 4 of title 24, C.R.S., and after a hearing thereon as provided in said article 4 . . . .") Viewed from this perspective, McBeth's claim is that she did not receive adequate

process when she chose to forego the process that she would have been afforded in a suspension proceeding. That claim is insufficient as a matter of law to state a procedural due process violation. Therefore, McBeth has failed to demonstrate that Santi and Wagoner violated her constitutional right to due process when McBeth voluntarily relinquished her daycare license.

### 2. First Amendment

McBeth alleged that Santi and Wagoner also retaliated against her for seeking legal advice by threatening to suspend her license. The district court rejected this claim because, among other reasons, there was no evidence that Santi and Wagoner knew that McBeth had consulted an attorney. McBeth, 2007 WL 274743, at *4. But McBeth asserts that she informed Wagoner of her consultation with an attorney on June 26, and Wagoner acknowledges that McBeth told her about meeting with an attorney when she went to McBeth's home on that date. (App. at 271 ("Mrs. McBeth informed me that she had legal counsel under a prepaid legal services plan who had advised her to withhold those records and she had decided not to release records.").)

Nevertheless, we conclude that Santi and Wagoner are entitled to summary judgment on this claim. As noted above, to prove a First Amendment retaliation claim, McBeth must establish that (1) she was engaged in constitutionally protected activity, (2) the defendants' actions caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity, and (3) the defendant actions were substantially motivated as a response to her protected conduct.

28

See Nielander, 582 F.3d at 1165. While McBeth's consultation with an attorney constitutes protected activity under the First Amendment, see Malik, 191 F.3d at 1315, she has not produced any evidence to suggest that Santi and Wagoner were substantially motivated to seek the suspension of her license because of her consultation with an attorney.

When the qualified immunity inquiry turns on a subjective element, as it does when examining motive, the qualified immunity analysis is "modified slightly." Bruning v. Pixler, 949 F.2d 352, 356 (10th Cir. 1991). The defendant "must do more than merely raise the [qualified] immunity defense; he must make a prima facie showing of the objective reasonableness of the challenged conduct." Id. at 356-57 (quotation omitted); see also Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 847-48 (10th Cir. 2005) (applying "objectively reasonable" analysis to the "substantially motivated" prong of a First Amendment retaliation claim). "If the defendant makes this prima facie showing, the plaintiff must then produce specific evidence of the defendant's culpable state of mind to survive summary judgment." Bruning, 949 F.2d at 356.

Santi and Wagoner have little trouble making a prima facie showing of the objective reasonableness for seeking the suspension of McBeth's license. As noted above, Santi and Wagoner had legitimate statutory bases for seeking the suspension of the license. In addition, Santi stated in her affidavit that DHS did not decide to seek suspension of McBeth's license until DHS learned that McBeth's son had molested a second child in addition to McBeth's granddaughter. And at that point, rather than

29

simply commencing suspension proceedings against McBeth, which, if successful, would have resulted in a negative licensing action being placed on her record, see Colo. Rev. Stat. § 26-6-102(5.7)(a), Santi and Wagoner gave McBeth the option to relinquish her license voluntarily. We conclude that this evidence constitutes a prima facie showing that Santi and Wagoner acted objectively reasonably when they sought suspension of McBeth's daycare license.

The burden then shifted to McBeth to provide "specific evidence" of Santi's and Wagoner's "culpable state of mind." Bruning, 949 F.2d at 356. McBeth lacks any such evidence. McBeth contends that Santi and Wagoner knew that Forsyth was accused of molesting two children, as opposed to just Forsyth's own daughter, prior to Wagoner meeting with McBeth on June 26. And because Santi stated that it was this fact that prompted DHS to decide to suspend McBeth's license, McBeth argues that the evidence that Santi and Wagoner knew ahead of time that two children were involved shows that their only motivation was to retaliate against McBeth once they learned she had spoken to an attorney.

McBeth bases her argument that Santi and Wagoner learned about the allegations concerning E.W. prior to the afternoon of June 26 solely on a computer-generated document created by DHS. The document, with a heading that reads "Child Care Facility-Complaint Tracking System," states that McBeth's son was arrested "for sexual

30

assault on his child <u>and another child</u>."[7] (App. at 330-32 (emphasis added).) The document lists "6/26/01" as the "Date Received" and "10:50:59 AM" as the "Time Received," which McBeth argues shows that DHS already knew that there was a second child victim prior to Wagoner's visit to McBeth's home on the afternoon of the 26th. (<u>Id.</u>) In the same paragraph that states two children were involved, however, the document also details the meeting between Wagoner and McBeth on the afternoon of the 26th. The document thus could not have been entirely generated at 10:50 a.m. on June 26. This document therefore cannot reasonably be read the way that McBeth urges, and so it does not create a genuine issue as to when Santi and Wagoner learned of the allegations concerning E.W. <u>See</u> <u>Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1326 (10th Cir. 1999) ("[A]n issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." (quotation omitted)).

McBeth therefore has no specific evidence demonstrating that Santi and Wagoner were "substantially motivated" by a desire to retaliate against McBeth for speaking to an attorney. <u>See</u> <u>Nielander</u>, 582 F.3d at 1165. There is no evidence to refute the position taken by Santi and Wagoner that they sought suspension of McBeth's license because the

---

[7] On appeal, Santi and Wagoner object to the admissibility of the document on the grounds that is not authenticated. They did not make this objection in the district court, however, and simply stated that the document was consistent with their view of the facts. Since the argument contesting the admissibility of the evidence was not raised below, Santi and Wagoner have waived it. <u>Jones v. C.I.R.</u>, 903 F.2d 1301, 1303 n.2 (10th Cir. 1990).

allegations against Forsyth concerned two children, one of whom was unrelated to Forsyth. Summary judgment was thus proper on this claim.

### 3. Fourth Amendment

McBeth argues on appeal that Santi and Wagoner retaliated against her for exercising her Fourth Amendment rights when she refused to give Himes her records in the absence of a warrant. She never raised such a claim in the district court, however, and has thus waived the claim. See Anderson v. Commerce Constr. Servs., Inc., 531 F.3d 1190, 1198 (10th Cir. 2008) ("By not arguing this issue before the district court, [the plaintiff] waived it."). While the Complaint mentions the Fourth Amendment at one point, it is unclear which defendants McBeth believed violated her Fourth Amendment rights, and she did not clarify the issue during the summary judgment briefing. In responding to Santi and Wagoner's motion for summary judgment, McBeth stated that her "clearly established Fourth Amendment rights were violated," but in the ensuing discussion of that claim, she only refers to Himes' conduct. (App. at 306-07 ("Plaintiff had a clearly established constitutional right based on the Fourth Amendment when she believed that it was unreasonable for Defendant Himes to request the materials concerning her former child care clients to insist that he seek a warrant based upon probable cause.").) In fact, nowhere in the Fourth Amendment section of her brief filed in response to Santi and Wagoner's motion for summary judgment does she even mention Santi and Wagoner.

Based on the lack of allegations against Santi and Wagoner, the district court reasonably concluded that, "[w]hile Ms. McBeth asserts a claim for deprivation of her Fourth Amendment rights against Defendants collectively, it is clear the claim is directed to Officer Himes only" because "McBeth offers no fact or legal theory of relief against either Santi or Wagoner in support of any Fourth Amendment claim against them." McBeth, 2007 WL 274743, at *5, n.4. We agree that McBeth did not allege any Fourth Amendment claim against Santi and Wagoner below, and she may not do so for the first time on appeal. See Anderson, 531 F.3d at 1198.

## III.     Conclusion

We DISMISS McBeth's appeal (no. 07-1283) as it relates to Himes, and otherwise AFFIRM the ruling of the district court granting summary judgment to Santi and Wagoner. We REVERSE the district court's denial of qualified immunity to Himes in appeal 07-1165. We REMAND for proceedings consistent with this opinion.