*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MARY HILL d/b/a WILD ROSE GARDENS ASSISTED LIVING HOME, | ) ) ) ) | |
| | ) | Supreme Court Nos. S-13693/13713 |
| Appellant, | ) ) | |
| | ) | Superior Court No. 3PA-07-01658 CI |
| v. | ) | |
| | ) | O P I N I O N |
| LINDA GIANI, STATE OF ALASKA, DEPARTMENT OF HEALTH & SOCIAL SERVICES, and STACI COLLIER, | ) ) ) ) | No. 6756 – March 8, 2013 |
| | ) | |
| Appellees. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Vanessa White, Judge.

Appearances: John C. Pharr, Law Offices of John C. Pharr, Anchorage, for Appellant. Marc W. June, Law Offices of Marc June, Anchorage, for Appellee Linda Giani. Janell M. Hafner, Assistant Attorney General and Daniel S. Sullivan, Attorney General, Juneau, for Appellees State of Alaska, Department of Health and Social Services and Staci Collier.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices. [Christen, Justice, not participating.]

PER CURIAM.
STOWERS, Justice, with whom CARPENETI, Chief Justice, joins in part, concurring.
FABE, Justice, dissenting.


I.      INTRODUCTION

Mary Hill, the owner of an assisted living home, sought damages from Linda Giani, an independent care coordinator; the Department of Health and Social Services (DHSS); and Staci Collier, a state licensing specialist; for alleged economic harm caused by a Report of Harm filed by Giani, which resulted in the removal of one of Hill's residents and a subsequent investigation conducted by Collier. The superior court granted summary judgment: to DHSS and Collier on Hill's state law tort claims on the basis of immunity under AS 47.32.160(a); to Collier on Hill's 42 U.S.C. § 1983 due process claim because Hill failed to establish a genuine issue of material fact as to whether Collier's actions deprived her of a constitutional right; and to Giani on the basis of immunity under AS 47.24.120 and common law privilege. Hill appeals. We affirm the court's grants of summary judgment to DHSS and Collier on the basis of immunity under AS 47.32.160(a) and to Collier on Hill's § 1983 claim. Because we find that Hill raised a genuine issue of material fact as to whether Giani acted in good faith when she filed her Report of Harm, we reverse the grant of summary judgment to Giani and remand for further proceedings.

Giani cross-appeals the court's grant of attorney's fees under Alaska Civil Rule 82. In light of our reversal of summary judgment, the attorney's fee awarded to Giani is vacated.

## II. FACTS AND PROCEEDINGS

### A. Facts

Hill owns and operates Wild Rose Gardens Assisted Living Home (Wild Rose), an assisted living home in Palmer licensed for four residents. J.H. moved into Wild Rose in the mid-1990s at the age of 18 and continued to live there until 2005.[1] J.H. has diagnoses of mental retardation, severe psychomotor seizure disorder, Raynaud's Syndrome, B-Thalassemia, Oppositional/Defiant Disorder, and symptoms associated with Asperger's Syndrome. Giani became J.H.'s independent care coordinator in 1999. As a State-certified care coordinator paid by the State, Giani's responsibilities included coordinating services between government agencies, providing information to parents, and developing and enforcing plans of care.[2] A team of people assisted with J.H.'s care at Wild Rose, including Larry H., J.H.'s father and legal guardian; Giani; the Ready Care agency, which coordinated J.H.'s care, paid Giani, and supplied aides to assist Hill during the day; and Hill.

In 2005 Hill told Larry H. that "they should start looking for another placement for J.H." because Hill was unable to provide appropriate care for and was "not making progress with" J.H. According to Larry H., Hill said that J.H.'s behavior was "making it just too difficult for her to handle." Larry H. also testified that Hill was suffering from migraines and could not come to the door at times during his visits to Wild Rose, which he felt was an "additional reason to believe that [Hill] could not take care of [J.H.] properly and [that J.H.] would have to find a new place to live."

On May 12, 2005, Giani submitted a Mental Retardation and Developmental Disability Plan of Care (Plan of Care) for J.H. covering the period of

---

[1] We use initials to protect J.H.'s privacy.

[2] *See* 7 Alaska Administrative Code 130.319(1) (2013).

June 1, 2005 to May 31, 2006, which set forth goals and objectives for J.H.'s care and was to be submitted to the State for funding approval. Giani described J.H.'s condition, placement, care providers, and the status of her treatment and care at Wild Rose. Giani noted that over the prior year there had been "increases in oppositional/defiant behaviors, increases in violent behaviors, and regression in all skill areas" which "required a significant increase in verbal and non-verbal cueing, prompts and modeling, physical assistance, and supervision and monitoring [to] meet her needs and insure her health and safety." Giani then stated that "[J.H.'s] team care[s] very deeply about her health, safety, and welfare" and that "[J.H.] loves her home environment and all of her care providers and often expresses that she never wants to leave [Hill's facility]." The Plan of Care also referred to a "Behavior Modification Plan" for J.H., "in which consequences include loss of recreation privileges in the community." Later, in a section titled "Goals and Objectives," Giani noted that J.H. would "receive positive feedback and incentives for appropriate social interactions" and negative feedback "via brief reminders, leaving the room, her 'audience' leaving, or loss of preferred social activities" for inappropriate interactions.

According to Hill, on August 1, 2005, Giani "unexpectedly" informed Hill that Giani was going to move J.H. According to Larry H., although Hill had "changed her mind" about wanting to find a new placement for J.H., he "did not change [his] mind about the need to have [J.H.] move to a new residence"; he was also "concerned that [Hill] would change her mind again and continued to be concerned about [Hill's] headaches and her physical ability to care for [J.H.]." According to Larry H., he found a new place for J.H. to live "[w]ith Linda Giani's help," and although he "appreciated Mary Hill's many years of care for [J.H.]," it was his decision to move J.H., and he "believed that decision was in [J.H.'s] best interests."

On August 2, 2005, Giani filed a confidential Report of Harm for the Protection of Vulnerable Adults (Report of Harm) with DHSS pursuant to AS 47.24.010.[3] The Report of Harm described a variety of both repeated and isolated incidents of abusive behavior by Hill towards J.H. that allegedly were observed by Giani and Ready Care staff over the six preceding months, and stated that the "incidents have increased over the past 90 days."

The incidents alleged in the Report of Harm include Hill repeatedly "yelling at [J.H.] and calling her stupid" and "repeatedly telling [J.H.] that she doesn't deserve to live at [Wild Rose]"; confinement of J.H. to her bedroom for most of the 2004-05 winter as a result of perceived bad behavior; denial of visitation to J.H.'s father; forcing J.H. to shower four times within a 30-minute period because she was unable to rinse soap out of her hair; refusing to readmit J.H. after sending her to Alaska Psychiatric Institute (API) and Providence Hospital for psychiatric evaluation; and defensive behavior by J.H. — such as covering her face with her hands when asked questions — over the two weeks preceding the Report of Harm. The Report also noted that Hill had notified Giani and Larry H. that she was no longer able to provide J.H.'s care because J.H.'s behavior was "out of control," that Giani had identified a potential new placement and requested Hill's cooperation with a transition, and that Hill had then informed Giani that she "changed her mind and wanted to keep [J.H.]." The Report stated that after Hill decided that J.H. should remain at Wild Rose, Giani, Larry H., and the Ready Care staff noticed a significant change in J.H.'s behavior and believed that she might have been experiencing mental and verbal abuse that had "been occurring over a period of several years."

---

[3]     AS 47.24.010(a) requires that care coordinators "who, in the performance of their professional duties, have reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect . . . report the belief to the department's central information and referral service for vulnerable adults."

Finally, the Report stated that Giani believed J.H. was not getting the attention, assistance, or proper nutrition she required because Hill's health was declining, and concluded that J.H. should be "removed from the home immediately."

On August 11, 2005, J.H. was removed from Wild Rose.

Giani's Report of Harm triggered an investigation by DHSS, as required by statute.[4] Collier, a state licensing specialist, investigated Giani's Report of Harm by visiting Wild Rose, Ready Care, and J.H.'s new assisted living home, and interviewing Giani, Hill, J.H., Larry H., J.H.'s doctors, and others at Ready Care.

According to Hill, on September 14, 2005, Collier called Hill and told her that she wanted Hill to "show [her] cooperation" with the investigation by faxing a letter to DHSS stating that she would not take any new clients until the investigation was complete. Hill believed that this was a formality, "didn't think [the investigation] would take long," and "wanted to be cooperative," so she submitted a fax stating that she would not take any new residents. Hill admitted in an interrogatory that "during the course of a September 14, 2005 telephone conversation with Staci Collier, [she] agreed to stop taking further clients."

---

[4]      AS 47.24.015(a) states:

Upon the department's receipt of a report under AS 47.24.010 that is not transferred under AS 47.24.013, the department, or its designee, shall promptly initiate an investigation to determine whether the vulnerable adult who is the subject of the report suffers from abandonment, exploitation, abuse, neglect, or self-neglect. The department, or its designee, shall conduct a face-to-face interview with the subject of the report unless that person is unconscious or the department, or its designee, has determined that a face-to-face interview could further endanger the vulnerable adult.

On November 7, 2005, Collier issued a Report of Investigation and Notice of Violation, which found that some of Giani's factual allegations were substantiated and others were not. Specifically, the investigation report found that Hill was restricting J.H.'s access to family members, was not following orders for medication administration, had refused to take J.H. back into her residence after sending her to API, and had prevented J.H. from leaving Wild Rose, attending Special Olympics, receiving Christmas presents, and visiting friends as mechanisms of behavior modification. Collier ultimately "found no preponderance of evidence to substantiate [the abuse of resident] allegation under existing Licensing Regulations," but determined that J.H.'s "[r]ights were violated" by Hill's restrictions. The Notice of Violation included an Order of Correction, which required Hill to adopt and submit to DHSS a restraint policy for Wild Rose. DHSS also issued a Notice of Administrative Sanction imposing five sanctions: (1) reducing Wild Rose's licensing status to "probationary" until June 30, 2006; (2) reducing Wild Rose's licensing capacity to one through the probationary period; (3) prohibiting Wild Rose from accepting residents requiring 24-hour care through the probationary period; (4) requiring Wild Rose to submit supervision requirements for new residents to DHSS for review and approval during the probationary period; and (5) requiring Wild Rose to pay a $1,200 fine.

On November 18, 2005, Hill filed an administrative appeal in which she contested DHSS's actions and requested a hearing. A hearing was scheduled for February 22, 2006.

On February 10, 2006, the Office of the Attorney General sent a letter to Hill's attorney informing him that DHSS was withdrawing the Notice of Administrative Sanction because a newly adopted senate bill changed the expiration date of Wild Rose's license such that a final decision on Hill's administrative appeal would "most likely not be rendered" until Wild Rose's license was "nearly set to expire." The letter stated that

DHSS's decision to withdraw the Notice of Administrative Sanction rendered Hill's administrative appeal moot, and that DHSS had thus filed a Motion to Dismiss. The letter noted, however, that the decision to withdraw the Notice of Administrative Sanction did not affect the validity of the Notice of Violation and corresponding Report of Investigation, and that Wild Rose was still required to comply with the Order of Correction. Hill did not oppose the Motion to Dismiss.

### B. Proceedings

On August 7, 2007, Hill filed suit against Giani, Collier, and DHSS. Hill's second amended complaint included claims for: (1) negligent supervision against DHSS; (2) intentional interference with contract rights against Collier; (3) intentional interference with prospective economic advantage against Collier; (4) a federal due process violation under 42 U.S.C. § 1983 against Collier; (5) intentional interference with contract rights against Giani; (6) intentional interference with prospective economic advantage against Giani; (7) defamation against Giani; and (8) intentional and negligent infliction of emotional distress against all defendants.

DHSS and Collier moved for summary judgment on the grounds that Hill's state law tort claims were barred by AS 47.32.160(a), which provides statutory immunity for licensing-related conduct, and that Hill had failed to state the necessary elements of a § 1983 due process claim. Giani moved for summary judgment on the grounds that Giani's actions in assisting Larry H. with J.H.'s move were privileged and that Giani was statutorily immune from suit under AS 47.24.010 with respect to claims based on the confidential Report of Harm.[5] Hill filed oppositions to both motions.

---

[5] Alaska Statute 47.24.010, the statute Giani relied on, requires certain individuals such as physicians and guardians to report to DHSS whenever they have "reasonable cause to believe that a vulnerable adult suffers from abandonment, (continued...)

On July 21, 2009, after hearing oral argument, the superior court granted both motions for summary judgment. The court denied Hill's motion for reconsideration.

Hill appeals both grants of summary judgment.

Giani cross-appeals the superior court's award of attorney's fees to her, claiming that the court erred in awarding her Rule 82 rather than Rule 68 fees because she made and beat a $10 offer of judgment given in good faith.

## III. STANDARD OF REVIEW

We review grants of summary judgment de novo.[6] In reviewing a grant of summary judgment, we will "determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts."[7] We construe the facts in the light most favorable to the non-moving party and review the trial court's factual findings under the clearly erroneous standard.[8]

The applicability of both state and federal immunity are questions of law that are also subject to de novo review.[9]

---

[5](...continued)
exploitation, abuse, neglect, or self-neglect . . . ." Alaska Statute 47.24.120 provides that a person who makes such a report in good faith is immune from civil or criminal liability.

[6]     *Yost v. State, Div. of Corps., Bus. & Prof'l Licensing*, 234 P.3d 1264, 1272 (Alaska 2010).

[7]     *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992).

[8]     *McCormick v. City of Dillingham*, 16 P.3d 735, 738 (Alaska 2001).

[9]     *See Lawson v. Helmer*, 77 P.3d 724, 726 (Alaska 2003) (de novo review for state immunity); *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001) (de novo review for federal immunity).

## IV.   DISCUSSION

Hill raises three arguments on appeal:  (1) it was error to grant summary judgment to DHSS because DHSS is not immune under AS 47.32.160(a) or, alternatively, because AS 47.32.160(a) does not apply to Hill's negligent supervision claim; (2) it was error to grant summary judgment to Collier because there are genuine issues of material fact as to Hill's 42 U.S.C. § 1983 due process claim; and (3) it was error to grant summary judgment to Giani on the basis of "Immunity/Privilege" because there is a genuine issue of material fact as to whether Giani's Report of Harm was made in "good faith," as required under AS 47.24.120.

### A.   The Superior Court Properly Granted DHSS And Collier's Motion For Summary Judgment On Hill's State Law Tort Claims Based On Immunity Under AS 47.32.160(a).

Hill argues that the superior court erred in granting summary judgment to DHSS and Collier on Hill's state law claims because the claims are not barred under AS 47.32.160(a).

The superior court concluded that AS 47.32.160(a) provides statutory immunity to DHSS and Collier for all actions involving "implementation of licensing concerns," including removal of J.H. from Wild Rose, the investigation of concerns raised by Giani's Report of Harm, and Collier's request that Hill not take new residents until the investigation was complete, because those actions fell "within the purview of monitoring a licensed entity," which is immune under the statute.  We agree.

Alaska Statute 47.32.160(a) states:  "The department, its employees, and its agents are not liable for civil damages as a result of an act or omission in the licensure process, [or] the monitoring of a licensed entity . . . ."  The plain language of the statute indicates that both DHSS and Collier are immune from all of Hill's state law claims

against them because the claims are based on acts taken during the monitoring of a licensed entity.[10]

Hill cites two cases to support her general assertion that DHSS is not immune under AS 47.32.160(a): *Native Village of Eklutna v. Alaska Railroad Corp.*, in which we stated that our "unambiguous summation of the common law of sovereign immunity [is]: 'liability is the rule, immunity the exception,' "[11] and *Gates v. City of Tenakee Springs*, in which we stated that AS 09.65.070(d)(2), which immunized the State for damages resulting from policy decisions, would not immunize a municipality against a suit for damages caused by negligent operational decisions.[12]

Unlike the common law sovereign immunity at issue in *Alaska Railroad Corp.*, the statutory immunity applicable to DHSS and Collier in this case was specifically granted by the Alaska Legislature. Under this circumstance, immunity for the State and its employees while undertaking licensing-related activities is the rule, rather than the exception.[13] Unlike the statute discussed in *Gates*, which narrowly

---

[10] *Cf. J & L Diversified Enter., Inc. v. Municipality of Anchorage*, 736 P.2d 349, 351-52 (Alaska 1987) (holding that plain language of state statute, which stated that no action for damages could be brought against a municipality or any of its agents, officers, or employees if the claim is based on licensing, precluded action for damages against the Municipality of Anchorage).

[11] 87 P.3d 41, 49 (Alaska 2004).

[12] 822 P.2d 455, 458-59 (Alaska 1991).

[13] *Cf. Native Vill. of Eklutna*, 87 P.3d at 49:

The presumption of immunity the Railroad seeks is a form of the State's sovereign immunity. When a party invokes a background rule granting it immunity, stated by neither the courts nor the legislature of Alaska, it would do well to confront how to square that rule with this court's

(continued...)

granted immunity for certain acts,[14] AS 47.32.160(a) explicitly grants broad immunity to the State and its employees for all acts *or omissions* in the licensure process or monitoring of a licensed entity. Thus, Hill's legal authority does not support her argument that AS 47.32.160(a) does not bar her state law claims against DHSS and Collier.

In the alternative, Hill argues that even if her other state tort claims are barred by AS 47.32.160(a), her negligent supervision claim does not fall under the grant of immunity in AS 47.32.160(a) because — under our holding in *B.R. v. State, Department of Corrections*[15] — the State negligently breached its duty to protect vulnerable persons whom it undertook to protect, a duty that is separate from its employment relationship with Collier and thus not covered by immunity.

In *B.R.* we held that the Alaska intentional tort immunity statute did not preclude claims against the State by an inmate who was sexually assaulted by a State employee to the extent that the claims were based on either (1) a breach of the duty to supervise employees other than the intentional tortfeasor employee, or (2) a breach of the State's independent protective duty to prevent assault.[16] We explained that the

---

[13](...continued)
> unambiguous summation of the common law of sovereign immunity: 'liability is the rule, immunity the exception.' . . . And by abolishing the State's common law immunity to suits sounding in contract, quasi-contract, or tort, the legislature has shown complementary disfavor for sovereign immunity.

(citations omitted).

[14]    822 P.2d at 459.

[15]    144 P.3d 431, 437 (Alaska 2006).

[16]    *Id.*

intentional tort immunity statute did, however, preclude the inmate's negligent supervision claims against the State "to the extent that they merely assert[ed] breaches of the department's duty to exercise due care in hiring, training, and supervising the [intentional tortfeasor] as its employee."[17]

Hill has not alleged that DHSS breached a duty to supervise employees other than Collier. Also, unlike the situation in *B.R.* where employees other than the intentional tortfeasor were identified as potentially contributing to the alleged harm,[18] Collier was the only State employee who Hill alleges engaged in wrongful conduct. Thus, Hill's claim is not based on a theory that the State breached a duty to supervise employees other than the intentional tortfeasor, but is merely a claim that the State negligently supervised or trained Collier, a claim which is barred by AS 47.32.160(a).

Hill also asserts that "the [S]tate has a duty to protect the vulnerable persons, at least the ones whom it undertook to protect," suggesting that her negligent supervision claim may be based on a theory that the State breached an independent protective duty that it owed to J.H. Hill cites *R.E. v. State*, in which we held that the State Division of Family and Youth Services (DFYS) had a duty to exercise reasonable care in carrying out state licensing of daycare facilities because the State created a special relationship between the State and parents when it voluntarily undertook the responsibility of licensing, creating a duty to safeguard daycare children from foreseeable harm by daycare providers.[19] We concluded that DFYS was not immune

---

[17]     *Id.* at 435.

[18]     *Id.* at 437.

[19]     878 P.2d 1341, 1347-48 (Alaska 1994).

-13-                                                                6756

from liability regarding claims by parents that the State was negligent in licensing daycare facilities where their children were sexually abused.[20]

Although *R.E.* might theoretically support a claim by Larry H. that the State had breached a protective duty it owed to him in negligently licensing Hill, it does not support a claim by Hill — a licensee — against the State. Hill does not offer any support for a negligent supervision claim based on a theory that the State breached a separate protective duty it owed to Hill.[21]

Because Hill has neither identified any State employees other than Collier who were involved in the investigation nor explained how the State breached a separate protective duty that it owed to Hill, we affirm the superior court's conclusion that DHSS was immune from liability for Hill's negligent supervision claim under AS 47.32.160(a). Because Collier and DHSS are immune from liability for damages based on actions taken while monitoring Hill, we affirm the superior court's grant of summary judgment to the State and Collier on Hill's state law tort claims.

B. **The Superior Court Properly Granted Summary Judgment To Collier On Hill's 42 U.S.C. § 1983 Claim.**

Next, Hill argues that the superior court erred in granting summary judgment on her 42 U.S.C. § 1983[22] federal due process claim against Collier because:

---

[20]    *Id.* at 1349.

[21]    We do not need to address whether Hill has third-party standing to bring an action against the State under *R.E.* for breach of a protective duty it owed to J.H. because Hill admits in her Reply Brief that she "does not claim to be asserting any of J.H.'s rights — only her own."

[22]    Title 42 U.S.C. § 1983 (1996) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the

(continued...)

(1) "[t]he deprivation of the right to make a living without due process is [a] deprivation of a constitutionally-protected right"; (2) "[t]he record does not reflect that Hill was accorded due process"; and (3) there was at least a genuine issue of material fact as to whether Hill voluntarily gave up her right to due process before "being deprived of her constitutionally-protected right to make a living."

Although Hill does have a protected interest in her assisted living home license, we conclude that Hill's federal due process rights were not violated because the temporary and voluntary partial suspension of her license did not constitute a state deprivation of a constitutionally protected right.[23]

To assert a 42 U.S.C. § 1983 claim for violation of federal due process rights, a claimant must show that the conduct complained of was committed by a person

---

[22](...continued)
> District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[23] The superior court found that Hill had not identified a legally protected interest. We conclude that Hill's interest in maintaining her assisted living care license is a protected property interest, but because we find that Collier's request that Hill not take any new residents did not constitute a deprivation, the superior court's finding that Hill had not identified a legally protected interest was harmless error. We must disregard harmless errors that have no substantial effect on the rights of the parties or on the outcome of the case. *See, e.g.*, *Fairbanks N. Star Borough v. Rogers & Babler*, 747 P.2d 528, 531 (Alaska 1987) ("Even if a finding of fact or conclusion of law is erroneous, the mistake is not grounds for reversal if the finding or conclusion is not necessary to the court's ultimate decision.").

acting under color of state law and deprived the claimant of a constitutional right.[24] It

is undisputed that Collier was acting under color of state law when she requested that

Hill voluntarily agree not to take on a new resident while the investigation proceeded.

At issue is whether Collier's actions during the investigation deprived Hill of a

constitutionally protected right.

> **1.      Hill had a constitutionally protected property interest in her assisted living home license.**

In *Button v. Haines Borough*, we held that commercial tour permit

applicants are entitled to due process of law during the permit application process; we

cited earlier decisions in which we held that holders of liquor licenses, business licenses,

limited entry fishing permits, hunting guide licenses, and driver's licenses have due-

process-protected property rights in those permits and licenses.[25] Similarly, in *Herscher*

*v. State, Department of Commerce*, we held that the appellant's proprietary interest in his

hunting guide license was of sufficient importance to warrant due process protection,

stating:

> It has long been recognized that an interest in a lawful
> business is a species of property entitled to the protection of
> due process. . . . This interest may not be viewed as merely a
> privilege subject to withdrawal or denial at the whim of the

---

[24]      *Okpik v. City of Barrow*, 230 P.3d 672, 677 (Alaska 2010).

[25]      208 P.3d 194, 207 (Alaska 2009) (citing *Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd.*, 991 P.2d 202, 211 (Alaska 1999) (holding that liquor license renewal applicant had protected property right); *Hilbers v. Municipality of Anchorage*, 611 P.2d 31, 36 (Alaska 1980) (holding that initial issuance of business license is protected); *Bartlett v. State Commercial Fisheries Entry Comm'n*, 948 P.2d 987, 990 (Alaska 1997) ("An individual's interest in an application for a limited entry fishing permit is entitled to due process."); *Javed v. Dep't of Pub. Safety*, 921 P.2d 620, 622 (Alaska 1996) ("A driver's license represents an important property interest which is protected under the due process clause of the Alaska Constitution.")).

[S]tate . . . . Neither may this interest be dismissed as de minimis. A license to engage in a business enterprise is of considerable value to one who holds it.[26]

In this case, Hill has a protected property interest in her assisted living home license, which, like a guide license, enabled Hill to follow her "chosen pursuit" as a care giver and owner of an assisted living home.[27] As such, she was entitled to due process, or "notice and an opportunity to be heard," prior to being deprived of her assisted living home license.[28]

### 2. Collier's actions did not deprive Hill of her property interest without due process of law.

A review of the record reveals that all of Collier's actions other than her September 14, 2005 request that Hill cease taking new clients were explicitly required or authorized by AS 47.32.120-150, which describe the required procedures for licensing-related investigations, reports, enforcement actions, and hearings.[29] Federal qualified immunity bars a § 1983 action against a government official unless the "contours of the right" allegedly violated are "sufficiently clear that a reasonable official

---

[26] 568 P.2d 996, 1002 (Alaska 1977).

[27] *Id.* at 1003.

[28] *See id.* at 1002 ("Due process of law requires that before property rights can be taken directly or infringed upon by governmental action, there must be notice and opportunity to be heard." (citing *Goldberg v. Kelly*, 397 U.S. 254 (1970))).

[29] Hill received a copy of Collier's report and Notice of Violation within ten working days after the investigation was complete, as required by AS 47.32.120(a). The State was authorized by AS 47.32.130 to immediately suspend Hill's license without an administrative hearing and Hill received notice that her license was suspended as required by AS 47.32.130(b)(2). Hill was given an opportunity to cure the violations within a reasonable time as required by AS 47.32.140(a). And Hill took advantage of her right to request a hearing under AS 47.32.150.

would understand that what he is doing violates that right."[30] Thus, Collier is immune from suit for all of the procedures she followed during the investigation that were required by statute, because no reasonable official would have reason to believe that conduct required or permitted by statute would violate a licensee's federal due process rights.

Hill's federal due process claim therefore turns on whether Collier's request that Hill voluntarily and temporarily refrain from taking additional residents until the investigation was complete constituted a "deprivation" of Hill's property interest in her assisted living home license. We conclude that it did not. Although Hill certainly relinquished a property right, Collier did not actually deprive her of that right. Absent coercion, voluntarily relinquishing a property interest does not trigger due process protections.

The Tenth Circuit Court of Appeals reached the same conclusion when presented with a similar issue in *McBeth v. Nimes*.[31] Employees from the Colorado Department of Human Services (DHS) pressured McBeth to relinquish her daycare license after her son, who lived with her, was charged with sexual abuse of a child.[32] The DHS employees informed her that if she voluntarily relinquished her license, it would be easier for her to have it reinstated later.[33] McBeth relinquished her license but later claimed that the DHS employees violated her due process rights by coercing her into relinquishing her daycare license without notice of any violations and an opportunity

---

[30]  *Smith v. Stafford*, 189 P.3d 1065, 1076 (Alaska 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[31]  598 F.3d 708 (10th Cir. 2010).

[32]  *Id*. at 712.

[33]  *Id*. at 713.

to be heard.[34] The Tenth Circuit disagreed, holding that "if one voluntarily relinquishes some property or liberty interest, then she cannot have a claim for a due process violation because no state official deprived her of that interest."[35] McBeth argued that her surrender was not voluntary but "coerced" by the DHS employees' threat to suspend her license.[36] The Tenth Circuit rejected this argument, reasoning that DHS employees provided McBeth with two alternatives: she could voluntarily relinquish her license and avoid having the incident marked on her permanent record, which could impair her ability to reapply for a license, or she could proceed with the administrative suspension proceedings.[37] McBeth could not later claim "that she did not receive adequate process when she chose to forgo the process that she would have been afforded in a suspension proceeding."[38]

Similarly, Hill argues that her agreement to stop taking residents was not voluntary. But Hill produced no admissible evidence to support this argument. The

---

[34] *Id.* at 723.

[35] *Id*. *See also Monahan v. Romney*, 625 F.3d 42, 47 (1st Cir. 2010) ("Because Monahan voluntarily resigned, his claim that the defendants deprived him of a property interest within the meaning of the Due Process Clause necessarily fails."); *Yearous v. Niobrara Cnty. Mem. Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) ("If Plaintiffs resigned of their own free will, even as a result of Defendant's actions, then they voluntarily relinquished their property interests and, thus, Defendant did not deprive them of property without due process of law."); *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988) ("If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause.").

[36] *McBeth*, 598 F.3d at 723.

[37] *Id*. at 723-24.

[38] *Id*. at 724.

evidence before us indicates that Hill voluntarily agreed to stop taking residents until the investigation was complete,[39] and unsupported arguments in pleadings do not raise genuine issues of material fact.[40] Because Hill voluntarily agreed to refrain from taking new residents until the investigation was complete, she has failed to raise a genuine issue of material fact showing that Collier deprived her of her property interest. Accordingly, we affirm the superior court's grant of summary judgment to Collier on Hill's § 1983 federal due process claim.

C. **It Was Error To Grant Summary Judgment To Giani Based On Immunity Under AS 47.24.120**.

The superior court concluded that Giani was immune from liability under AS 47.24.120 for any harm caused by the quick removal of J.H. from Wild Rose, and ruled that summary judgment was proper because Hill had not met her burden of presenting evidence that raised a genuine issue of material fact as to whether Giani acted in good faith when she filed her Report of Harm.

Hill argues that the superior court erred in granting summary judgment to Giani on the basis of immunity under AS 47.24.120 because she raised a genuine issue of material fact as to whether Giani acted in good faith. We agree.

---

[39]     Although Hill contends that there is at least a genuine issue of material fact as to whether she voluntarily gave up her right to due process, Hill admitted in an interrogatory that she agreed to Collier's request, she stated in her deposition that she "wanted to be cooperative and so [she] did as [Collier] said and sent the fax saying [she] wouldn't take any new clients," and on September 14, 2005, she submitted a handwritten note stating that she would not receive any new clients.

[40]     *See Fenner v. Municipality of Anchorage*, 53 P.3d 573, 578 n.25 (Alaska 2002) (quoting *Christensen v. NCH Corp.*, 956 P.2d 468, 474 (Alaska 1998)) (stating mere assertions of fact in pleadings are insufficient to raise a genuine issue of material fact).

Alaska Statute 47.24.120(a) states: "A person who in good faith makes a report under AS 47.24.010, regardless of whether the person is required to do so, is immune from civil or criminal liability that might otherwise be incurred or imposed for making the report." The parties agree that Giani was a mandatory reporter under AS 47.24.010(a) and thus had qualified immunity for claims based on harm caused by Giani's Report of Harm under AS 47.24.120(a) so long as the report was made in good faith.[41]

Although we have not addressed AS 47.24.120(a) previously, we have developed standards for determining whether summary judgment should be granted to a party whose actions are protected by qualified official immunity, provided that the party acted in "good faith."[42] In such cases, when qualified official immunity is raised as grounds for summary judgment, the nonmoving party must present some admissible evidence that creates a genuine issue of material fact regarding whether the official acted in good faith.[43] We will consider affidavits, depositions, admissions, answers to interrogatories, and similar materials, but unsubstantiated allegations in the complaint or opposition alone are insufficient to create a genuine issue of material fact regarding state of mind.[44]

In *Smith v. Stafford*, we reviewed a grant of summary judgment based on qualified official immunity and held that Smith's sworn affidavit — which stated that a

---

[41] Under AS 47.24.010(a), Giani is required to file a report to the DHSS if she has "reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect."

[42] *See, e.g.*, *Smith v. Stafford*, 189 P.3d 1065 (Alaska 2008).

[43] *See id.* at 1074.

[44] *Id.* at 1072-74.

state social worker had staged photographs of garbage and beer cans around Smith's home to create false evidence implying he had an alcohol problem, and that the social worker had threatened that Smith would never see his child again if he complained about or questioned the official's authority — was sufficient to create a genuine issue of material fact about the official's state of mind because "[t]he statements in the affidavit, if true, indicate that [the social worker] may have been acting in bad faith."[45] Although we recognized the evidence supporting Smith's claim of bad faith was "scant" and his assertions "may be unsubstantiated by other evidence," these assertions were sufficient to create a genuine issue of fact because they were "made in an affidavit of a 'duly sworn' witness, and they correspond to allegations made in [the complaint]."[46] In short, Smith presented "some admissible evidence" that the social worker acted "maliciously, corruptly, or in bad faith," and therefore, summary judgment was improper.[47]

Turning to the statutes at issue here, the primary goal behind AS 47.24.010 is to protect vulnerable individuals, and the purpose of AS 47.24.120(a) is to encourage those who are required to report to do so without fear that their reports will subject them to liability. Because AS 47.24.010 explicitly requires certain individuals to report any behavior that gives them "reasonable cause to believe that a vulnerable adult suffers from abandonment, exploitation, abuse, neglect, or self-neglect," it is not enough to show that the reporter acted negligently. Instead, establishing a genuine issue of material fact as to whether a mandatory reporter acted in good faith requires a litigant to present

---

[45]    *Id*. at 1068, 1074-75.

[46]    *Id*. at 1074.

[47]    *Id*. at 1074-75.

admissible evidence indicating the reporter acted maliciously, corruptly, or in bad faith.[48] If the report is filed with a good faith belief that a vulnerable adult may have suffered harm, the reporter will be shielded from liability by AS 47.24.120(a) even if the reported belief is ultimately unsubstantiated. Evidence indicating the reporter filed the report of harm with a malicious or corrupt purpose or with the belief that no harm had actually occurred, however, is sufficient to raise a genuine issue of material fact as to whether the reporter acted in good faith. Thus, the relevant inquiry for determining whether admissible evidence creates a genuine issue of material fact whether a reporter acted in good faith is not whether the evidence shows that the alleged harm actually occurred, but whether the evidence shows that the reporter did not have a good faith belief that the alleged harm occurred.

Here, Hill bears the burden as the nonmoving party of establishing a genuine issue of material fact regarding whether Giani acted in bad faith.[49] Hill met that burden.

At the outset, it is important to recall that as a mandatory reporter, Giani was required to report to the State whenever she had reasonable cause to believe Hill was physically or emotionally abusing J.H.[50] The only report of harm in the record is the August 2005 Report; the reasonable inference in favor of Hill is that at no time prior to August 2005 did Giani have reasonable cause to believe Hill was physically or

---

[48]    *Id.* at 1075.

[49]    *Id.* at 1074.

[50]    *See* AS 47.24.010(a).

-23-                                                    6756

emotionally abusing J.H. — otherwise her failure to report would have been a violation of law and subject to misdemeanor charges.[51]

With respect to what Giani was doing, what she knew, and what she said about Hill prior to the August 2005 Report, the May 2005 Plan of Care is particularly relevant. The reasonable inference in favor of Hill is that Giani would be truthful in her Plan of Care that was to be submitted to the State, and that as a care coordinator Giani would make known any concerns she had about J.H.'s placement with Hill and about any failure by Hill to follow through with the care plan. In this light, it is significant that Giani's Plan of Care does not include any allegations of abuse; on the contrary, the Plan speaks highly of J.H.'s care at Hill's facility. This positive account is generally in tension with the negative portrayal of Hill in the Report of Harm submitted several months later. More important, the Plan of Care is apparently inconsistent with the allegations included in the Report of Harm on each of the following points.

First, the Report of Harm states that Hill yelled at J.H., called her stupid, and told her she didn't deserve to live in Hill's facility. The Report also states that J.H. "may be experiencing verbal and mental abuse [that] may have been occurring over a period of several years." At her deposition, Giani stated that Hill had been making the "didn't deserve" comment "almost ever since I began working with [J.H.] in 1999." Giani further stated that she had documented the yelling and "stupid" comments over a six-month period before the Report of Harm, and she had witnessed similar incidents over a period of at least a year before the Report of Harm. The Plan of Care, however, does not mention any such abuse, nor had Giani previously reported this allegedly long-term problem.

---

[51] *See* AS 47.24.010(c).

Second, Giani's Report of Harm suggests that Hill wrongfully deprived J.H. of certain "privileges," such as participation in recreational activities. Yet the Plan of Care specifically sets out a behavior modification plan Hill was supposed to follow, calling for both positive reinforcement for good behavior and loss of privileges for bad behavior. Moreover, Hill testified at her deposition as to how the loss of privileges worked, and her testimony is consistent with the May 2005 Plan.

Third, Giani's Report refers to an incident in which J.H. became overly aggressive to an attendant; Hill sought to have J.H. admitted to API and then refused to allow her to return for 72 hours. Giani's Report links the incident to poor implementation of the Behavior Modification Plan. At her deposition, Giani stated that her concern over this incident was primarily the 72-hour issue — she asserted this was a licensing violation that had to be reported or she would face misdemeanor charges. Yet this same incident is described in the Plan of Care as evidence of J.H.'s increased aggressive behavior. Further, if, as Giani asserted, she included this alleged licensing violation in the August 2005 Report of Harm because she was required to do so, it is unclear why she did not report the incident when she learned of it earlier that year. In sum, drawing reasonable inferences in favor of Hill from these apparent inconsistencies between Giani's Plan of Care and her Report of Harm, it could be concluded that Giani did not subjectively believe her statements in the Report of Harm.

In addition to these apparent inconsistencies between the Plan and the Report, Hill provided other evidence that, viewed in the light most favorable to Hill, further supports the conclusion that there are genuine issues of material fact regarding Giani's good faith. In the summary judgment proceedings, Hill submitted the affidavit of an 11-year employee familiar with J.H. who stated that she had never observed Hill abuse J.H. or "conduct[] herself inappropriately in any fashion as respects J.H.'s care." Moreover, Hill's employee specifically denied statements Giani had attributed to her in

the Report of Harm and further denied other allegations by Giani. Hill also submitted letters from doctors and other individuals describing Hill in complimentary terms completely contrary to Giani's description; although hearsay, there did not appear to be an evidentiary objection by Giani. Hill also provided sworn discovery responses that dispute the Report of Harm's assessment of J.H.'s allegedly defensive behaviors in the weeks preceding the Report, explaining that such behaviors were typical for J.H. and were not indicative of abuse.

Giani's Report of Harm is also inconsistent with Hill's deposition testimony that when Giani arrived to remove J.H., Giani and J.H.'s father hugged and comforted Hill and told Hill that "they knew [Hill] had not abused [J.H.]." Taking Hill's evidence as true and drawing all reasonable inferences in favor of Hill, Hill's evidence further supports the conclusion that Giani did not subjectively believe her statements in the Report of Harm.

Finally, in Hill's deposition testimony she stated that Giani "repeatedly threatened" that she would "make things very ugly" for Hill if Hill did not give up any objections to J.H.'s removal from Hill's facility. Taking this testimony as true for purposes of summary judgment, this may show a motive on Giani's part to override Hill's decision to continue with J.H.'s placement and to quickly remove J.H. from Hill's facility; this is further supported by the fact that Giani submitted the Report and helped to conduct the hurried move of J.H. out of Hill's facility when Giani believed Hill was away on vacation. Giani may have believed she was acting in J.H.'s best interests for placement when she made the Report, but knowingly making untrue statements in a Report of Harm is not protected by a good motive. At the summary judgment stage, to defeat a motion for summary judgment it is sufficient to present evidence raising a genuine issue of material fact that Giani knowingly made untrue statements in her Report of Harm.

Giani argues that "the DHSS investigation finding[] that Giani's reports were at least partially substantiated, in itself, demonstrates the good faith of Giani's actions." In fact, the investigation concluded that the most serious allegation against Hill, abuse of a resident, was unsubstantiated. Moreover, when Hill requested a hearing to contest the sanctions issued by DHSS,[52] the State withdrew its Notice of Administrative Sanction, mooting Hill's appeal. In any event, the DHSS investigation ultimately has little relevance to the issue of Giani's good faith; the DHSS report of investigation did not reach any conclusions concerning Giani's good faith and the results of the investigation cannot by themselves "demonstrate" her good faith.

In summary, viewing the evidence in the light most favorable to Hill,[53] there is admissible evidence that, if proven, could show Giani did not believe Hill had abused J.H. and filed the Report of Harm in bad faith. Hill's submission in opposing Giani's motion for summary judgment included deposition testimony, sworn discovery responses, an employee affidavit, numerous character reference letters (hearsay but not objected to by Giani in her reply), the May 2005 Plan of Care, and the August 2005 Report of Harm. As detailed above, this evidence created an issue of fact on whether Giani could honestly have believed the allegations in the Report of Harm. We therefore hold that it was error to grant summary judgment to Giani based on qualified immunity.[54]

---

[52] *See* former AS 47.33.550(d) (2004) (providing that "[a]n assisted living home may contest a licensing agency's decision to impose an administrative sanction by filing a written request for a hearing . . . no later than 10 days after receipt of the notice of administrative sanction").

[53] *McCormick v. City of Dillingham*, 16 P.3d 735, 738 (Alaska 2001) ("When considering whether the moving party is entitled to summary judgment, we construe the facts in the light most favorable to the non-moving party . . . .").

[54] In reaching this conclusion, we nevertheless sympathize with the dissent's
(continued...)

**D.      The Attorney's Fees Award Is Vacated.**

Giani cross-appeals the superior court's award of Rule 82 attorney's fees to Giani, arguing that the court erred in granting Rule 82 attorney's fees rather than attorney's fees under Rule 68. In light of the fact that we reverse the superior court's grant of summary judgment and remand for further proceedings, we vacate the award of attorney's fees to Giani.

## V.      CONCLUSION

We AFFIRM the superior court's grants of summary judgment to Collier and the State, REVERSE the superior court's grant of summary judgment to Giani, VACATE the court's award of attorney's fees to Giani, and REMAND for further proceedings.

---

[54](...continued)
point that a mandatory reporter such as Giani may be put in a difficult position when it is unclear whether there is a reasonable basis to believe there is abuse of an adult, especially when the State requires that a report should be made even if the reporter is in doubt about the abuse. On this matter, however, we must defer to the legislature, which created the standard of reporting, the mandatory nature of reporting for some individuals, and the standard for qualified immunity.

STOWERS, Justice, concurring, with whom CARPENETI, Chief Justice, joins only in paragraphs 1 through 3 of the concurrence.

I agree with the court's opinion. I write separately to respond to Justice Fabe's dissent. The dissent would hold that Giani is entitled to qualified immunity for having made a report of harm because many of Giani's allegations of harm were substantiated[1] by DHSS's investigation of Hill. In the dissent's view, the "truth of much of Giani's report strongly rebuts a claim by Hill that the report was made without a good-faith belief in the truth of its contents."[2]

The problem with the dissent's analysis is that the issue comes before the court on an appeal from a grant of summary judgment. Though the dissent's many factual arguments why Giani was not acting in bad faith when she made the report of harm seem persuasive in light of the comparatively weak evidence suggesting Giani may not have had a good faith basis for making the report, and these arguments may well carry the day when the case is tried to a jury, it is improper for a court on summary judgment to weigh the facts,[3] make credibility determinations,[4] or draw inferences from

---

[1]    When a DHSS employee "substantiates" an allegation of harm, all this means is that the employee investigating the allegation determined that there was something akin to probable cause to believe that the allegation was true — it does not mean the allegation has been proved to be true (which would require a hearing or a trial), and it does not mean the allegation has been established as fact.

[2]    Slip Op. Dissent at 32.

[3]    *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 804 (Alaska 2012) (citing *Meyer v. State, Dep't of Revenue, Child Support Enforcement Div., ex rel. N.G.T.*, 994 P.2d 365, 367 (Alaska 1999)).

[4]    *Id.*

the facts in favor of the party moving for summary judgment.[5]  But that is in essence what the dissent is doing:  the dissent parses and weighs the facts and circumstances surrounding Giani's plan of care; the affidavits, letters, and sworn discovery responses; and Hill's deposition testimony to conclude that none of this evidence is sufficient to raise a genuine issue of material fact.

I believe the court's opinion demonstrates why these various pieces of evidence suffice to create a genuine issue of fact, especially given our well-recognized standard that all inferences are required to be drawn in favor of the party opposing summary judgment and we are to view the evidence in a light most favorable to that party.[6]

But the dissent makes a good point that Giani finds herself in perhaps an impossible and unfair situation.  She is a mandatory reporter, who is required by law to make reports of suspected harm being caused to vulnerable adults in the care of care-providers,[7] and who could be liable for failing to make such reports.[8]  The Alaska Legislature has made a policy decision that in the important interest of protecting vulnerable citizens, mandatory reporters should not be subject to liability for making reports of harm.  But given the way the immunity statute is written, Giani does not enjoy complete immunity for making a report of harm; the statutory immunity granted is qualified by a good faith requirement.[9]  And as demonstrated by this case, the existence

---

[5]  *Olson v. City of Hooper Bay*, 251 P.3d 1024, 1033 (Alaska 2011).

[6]  *Miller v. Safeway, Inc.*, 170 P.3d 655, 658 (Alaska 2007).

[7]  AS 47.24.010(a).

[8]  AS 47.24.010(c).

[9]  AS 47.24.120(a) ("A person who in good faith makes a report under
(continued...)

of good faith is a factual question,[10] and if the subject of the report of harm is able to raise a genuine issue of material fact on the question of good faith, summary judgment in favor of the mandatory reporter will not be possible and a trial will be required.

The dissent persuasively argues that this court's opinion may create a Catch-22 by which a mandatory reporter like Giani could be liable both for reporting and for failing to report suspected harm; and that this court's decision undermines the legislative policy of encouraging people to report suspicions of abuse. While it certainly is not this court's intent to undermine the legislature's commendable policy, that may be exactly what this court's decision will do as a practical matter; if this is the outcome, it will be most unfortunate.

In light of this court's substantial jurisprudence on summary judgment, I doubt it will come as a surprise that we hold the qualified immunity statute will not provide immunity when the very thing that qualifies the immunity — good faith — becomes factually contested. It is the legislature's prerogative to make the policy decision whether immunity for mandatory reporters should be qualified or complete, and if the legislature believes that immunity should be complete, I am confident it will amend the statute to accomplish its purpose.

---

[9](...continued)
AS 47.24.010 . . . is immune from civil or criminal liability that might otherwise be incurred or imposed for making the report.").

[10] *See, e.g.*, *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1144 (Alaska 1996) (quoting Professor Corbin's statement that "Good faith always involves questions of fact." 3A ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 654B, at 96 (1960 & supp. 1994)).

FABE, Justice, dissenting.

I disagree with the court's decision to reverse the superior court's grant of summary judgment in favor of Giani. In my view, Hill has not demonstrated a genuine issue of fact as to whether Giani was acting in bad faith or with an evil motive when she filed her report of harm. What makes this decision especially disturbing is the fact that many of the allegations in Giani's report were substantiated. Indeed, Hill was found to have: (1) placed J.H. on restriction for weeks at a time; (2) prevented her from leaving the home; (3) taken away J.H.'s Christmas presents; (4) refused to allow J.H. to participate in the Special Olympics; and (5) isolated J.H. by preventing her from visiting with family or friends.[1] The truth of much of Giani's report strongly rebuts a claim by Hill that the report was made without a good-faith belief in the truth of its contents. Further, as the court's opinion points out, Giani was a mandatory reporter.[2] Had she not made a report, she could potentially have been held liable for her failure to report. The court, by creating potential liability for Giani's substantially true report, creates a Catch-22 by which Giani could be liable both for reporting and for failing to report. And the court's decision today undermines the legislative policy of encouraging people to report suspicions of abuse.

Summary judgment is appropriate where reasonable jurors could not disagree on the resolution of the issue.[3] I believe that the evidence presented to the court could not lead a reasonable juror to conclude that Giani acted in bad faith. I therefore believe that Hill has failed to raise a genuine issue of material fact.

---

[1]     Slip Op. at 5.

[2]     Slip Op. at 21.

[3]     *See Airline Support, Inc. v. ASM Capital II, L.P.*, 279 P.3d 599, 604 (Alaska 2012) (citing *Burnett v. Covell*, 191 P.3d 985, 990 (Alaska 2008)).

In order to recognize a factual question about Giani's good faith in the face of the corroborating DHSS investigation, the court is forced to conclude that the truth of Giani's claims is irrelevant to the question of her good faith.[4] But we have never before held that a mandatory reporter's good faith was in doubt where the report was later found to be truthful. It seems implausible that Giani made her report without a good-faith belief in its contents, only to be vindicated by coincidence. The court's decision to expose Giani to liability, despite the fact that investigation of her report revealed real and troubling mistreatment, conflicts with the legislature's stated policy of encouraging reporters and protecting the vulnerable.

The court also points out that the DHSS investigation failed to substantiate Giani's allegation of physical abuse.[5] But Giani merely passed along J.H.'s own report that her care provider had hit her. Giani's report also documented J.H.'s display of defensive behavior, which corroborated J.H.'s report of being struck by her care giver. Although the DHSS investigation could not confirm that J.H. was actually being abused, there doesn't seem to be any dispute that J.H. *claimed* that her care giver was hitting her or that Giani was compelled to report it. Certainly a single erroneous allegation in Giani's report of harm cannot demonstrate bad faith where the bulk of her allegations were substantiated and where these other allegations would have compelled Giani to file a report of harm, with all the attendant consequences for Hill. I therefore believe that the results of the DHSS investigation substantially corroborating Giani's report of harm put to rest claims that Giani was not acting in good faith.

----

[4]     Slip Op. at 27.

[5]     Slip Op. at 327

Despite the results of the DHSS investigation, the court concludes that Hill has presented sufficient evidence to put Giani's intentions in doubt.[6] In determining that Giani may have acted in bad faith, the court relies on four pieces of evidence. In my view, none of them presents a genuine factual question as to whether J.H. was being mistreated or whether Giani believed such mistreatment was real when she made her report.

First, the court finds it significant that Giani failed to make allegations of mistreatment in her plan of care, which she filed three months before her report of harm, and points to several sections in the plan which are arguably inconsistent with Giani's later allegations.[7] Despite the fact that the report of harm was written after several additional months of gathering information, and was corroborated by independent investigation, the court apparently feels that it is reasonable to conclude that the more positive picture described in the plan remained accurate at the time Giani filed her report.[8] This, says the court, could be evidence that Giani did not believe her own report. But a plan of care, which may be circulated to many different parties, may not be the appropriate document in which to communicate concerns about mistreatment. What is clear is that the basic validity of the concerns Giani raised in her report were confirmed, and nothing in the plan suggests that those findings were erroneous.

The court next points to affidavits, letters, and sworn discovery responses disputing Giani's allegations of mistreatment and describing Hill in complimentary

---

[6] Where qualified immunity is raised as a ground for summary judgment, the nonmoving party has the burden of presenting "some admissible evidence that creates an issue of fact as to whether the official acted in bad faith or with an evil motive." *Smith v. Stafford*, 189 P.3d 1065, 1074 (Alaska 2008).

[7] Slip Op. at 24-26.

[8] Slip Op. at 24.

terms.[9] But if the statute is to offer any protection to mandatory reporters, the mere fact that Hill disputes the allegations made against her cannot be enough to defeat Giani's immunity. Even if this evidence is accepted as true and the results of the DHSS investigation discounted, this is not evidence that Giani acted in bad faith.

Third, the court relies on Hill's statement in her deposition that when J.H. was removed from her home, both J.H.'s father and Giani attempted to comfort Hill: "[J.H.'s father] hugged me, as did [Giani], together at the same time, and *they both comforted me and told me that they knew I had not abused [J.H.]*." (Emphasis added.)[10] We must assume Giani made these statements. But it does not seem unusual that, in the emotionally fraught setting of J.H.'s removal, Giani and J.H.'s father would attempt to comfort Hill, who was obviously upset. If anything, Giani's actions in seeking to comfort Hill seem contrary to the idea that Giani was acting out of malice toward Hill. A jury could not credibly infer from this statement that Giani made her report in bad faith.

In any case, Giani never alleged that Hill was physically abusing J.H. She only reported that J.H., herself, had made such an accusation and was displaying defensive behavior consistent with that report. Thus, Giani's statement that she did not believe that Hill had abused J.H. does not contradict her account of what J.H. told her, which she was compelled to report as a mandatory reporter. Moreover, Giani's lay opinion that these behaviors were insufficient to prove abuse has little bearing on her good-faith belief in the truth of the underlying facts.[11]

---

[9] Slip Op. at 25-26.

[10] Slip Op. at 26.

[11] *See, e.g., Greywolf v. Carroll*, 151 P.3d 1234, 1242 (Alaska 2007) (A
(continued...)

Finally, the court points to Hill's allegations in her deposition that Giani repeatedly threatened to make things "very ugly" for Hill if Hill did not allow J.H. to be removed from her facility.[12] But these threats are alleged to have been made more than a week after Giani filed her report of harm. And the mere fact that Giani strongly desired to remove J.H. from Hill's facility after reporting mistreatment cannot reasonably be construed as evidence that Giani fabricated her report in bad faith.

All of this evidence taken together is distinguishable from the claim in *Smith v. Stafford* that a social worker staged phony pictures with beer cans and scattered garbage at the home of the parents in a child protection case.[13] In that case, though the social worker may have harbored good-faith concerns about the well-being of Smith's child, we concluded that "[m]anufacturing a scene of excessive alcohol consumption . . . to falsely create evidence to imply that Smith has an alcohol problem or is an unfit father could be malicious and corrupt," and that "[t]hreatening that Smith would never see his child in retaliation for complaining about those acts could likewise be evidence of malice."[14]

Our decision in *Stafford* suggests that Hill has not presented sufficient evidence to show a genuine issue as to Giani's good faith. To overcome Giani's immunity, Hill must present some evidence, beyond mere assertion, that Giani acted with

---

[11](...continued)
reporter's "lay assessment of whether the facts known to him were sufficient to support an assault charge d[id] not create a genuine issue material fact" about whether he had a good-faith belief in the truth of those facts.).

[12]     Slip Op. at 26.

[13]     189 P.3d 1065, 1069 (Alaska 2008).

[14]     *Id.* at 1075.

malice. The evidence relied on by the court in this case does not begin to meet this threshold.

I am particularly troubled by the court's opinion today because it threatens to undermine the public policy behind qualified immunity for reporters of abuse of the most vulnerable among us. The opinion correctly observes that "the purpose of AS 47.24.120(a) is to encourage those who are required to report to do so without fear that their reports will subject them to liability."[15] The legislature has provided immunity for reporters like Giani, and the State's policy favors reports of harm, accepting the risk that caretakers may be subjected to fruitless investigations in the interest of protecting vulnerable adults who might otherwise suffer in the shadows. A pamphlet published by DHSS makes this clear, advising, "If in doubt, make the report." Although only those reports made in good faith merit protection, in this case there is insufficient evidence to raise a question of fact as to Giani's bad faith or evil motive in filing the report. Because allowing this case to go forward could chill future reports by subjecting good-faith reporters to the threat of costly and stressful litigation, I would affirm the grant of summary judgment in this case. I therefore respectfully dissent.

---

[15] Slip Op. at 22.